[S. F. No. 16004. In Bank.—Aug. 25, 1941.]

LENALA A. MARTIN et al., Respondents, v. CALIFORNIA MUTUAL BUILDING AND LOAN ASSOCIATION (a Corporation) et al., Appellants. (And consolidated actions.)

Walter Carrington, D. T. Jenkins, Patrick J. Kearns and James C. Engebretsen for Appellants.

Herbert C. Jones, Lloyd A. Mason, Kenneth R. Malovos, J. M. Atkinson and Kenneth R. McDougall for Respondents.

GIBSON, C. J.—In these consolidated actions plaintiffs seek to establish their right to share equally with other creditors in the assets of the defendant California Mutual Building and Loan Association, an insolvent corporation now in process of liquidation by the defendant Building and Loan Commissioner. The commissioner appeals from an order of the superior court decreeing that plaintiffs are to share in the proceeds of liquidation as creditors, ratably with the holders of investment certificates.

Prior to 1924, the California Mutual Building and Loan Association was a mutual association in which the great bulk of the investments was represented by withdrawable, mutual membership shares having a right to full participation in the net profits of the corporation. These withdrawable shares, some of which were installment shares and some of which were fully paid shares, constituted the only type of proprietary or capital stock. Accumulated profits set aside as a reserve fund, and a small amount of investment certificates issued on the security of that fund, were its only non-withdrawable capital. On February 12, 1924, however, a change in the capital structure of the corporation was authorized by the shareholders, and the by-laws were amended to permit the issuance of 2500 shares of guarantee capital stock which was non-withdrawable and which was designed to be the proprietary stock of the corporation. Provision was also made for a *pro rata* distribution of the previously accumulated reserve fund among the mutual shareholders, and a majority of the directors was thereafter to be selected from the holders of the guarantee stock.

On March 11, 1924, the board of directors, in order to complete the conversion of the association from a mutual to a capital stock company, terminated the right of the mutual shares to full participation in future profits and restricted them to a dividend or interest rate of 6 per cent. By a second resolution the board instructed the secretary to take up all installment stock shares and to transfer them to fully paid shares or investment certificates at the option of the holders. The issuance of investment certificates, also bearing interest at 6 per cent, was authorized by a third resolution.

A fourth resolution provided for the establishment of "thrift accounts," hereinafter discussed.

Subsequent to the issuance of the guarantee stock, and the adoption of these several resolutions, the directors instructed officers and employees of the association to urge the exchange of all outstanding mutual shares, both installment and fully paid, for the non-stock form of investment certificate. No particular time was fixed for the consummation of the exchange. Accordingly, the association continuously pursued the policy of effecting the exchange of mutual shares for investment certificates. This was not done by written communication or public notice to investors or in any other regular manner, but by personal interviews with the mutual shareholders from time to time as they came into the company office. As a result of this policy, investors who in 1924, held mutual shares aggregating some $4,400,000 exchanged enough of them for non-stock investment certificates so that by the year 1932 only about $200,000 of the old mutual shares were still outstanding. Meanwhile $420,000 of thrift accounts had been issued, investment certificates outstanding had increased to approximately $12,000,000, and guarantee stock in the amount of $500,000 had been issued. There is evidence that failure to transform the remaining mutual shares to investment certificates was due largely, if not wholly, to the fact that holders thereof had not been informed of the right to make the exchange or had been assured that it was not necessary to make the transfer for the reason that the reorganization already had changed their status from proprietary owners to creditors on a parity with the holders of investment certificates. The trial court found that neither the association nor its officers had notified or informed plaintiffs of the plan, policy or course of action of the association, or had notified or informed plaintiffs that they had the "right, privilege, option or opportunity" to convert their mutual shares into investment certificates. It was further found that after the capital structure change of 1924, the association represented that upon the issuance of the guarantee capital stock, it became the proprietary stock and the mutual shares "became in effect, in reality, in substance and in truth merely borrowings or interest bearing indebtednesses of said association, and no longer true proprietary stock." Mutual shares were grouped with the investment certificates in the financial

statements of the association, and officials of the association testified to the consistent practice of dealing with the mutual shareholders as depositors or creditors after 1924 and until the association encountered financial difficulties. Large dividends were paid to the holders of guarantee stock while mutual shareholders were restricted to a 6 per cent return and the trial court found that although the mutual shares had voting power, the guarantee stockholders in fact controlled the corporation.

Some of the plaintiffs hold mutual shares issued prior to 1924. Others, however, hold shares issued as "thrift accounts" after 1924. These were mutual shares on which compulsory monthly payments over a long period of time were required. In soliciting these accounts the association drew no distinction between them and other accounts for the purchase of investment certificates, but represented that they offered a new plan for regular savings in which the investor would be rewarded upon completion of the long saving plan by receiving a higher yield of 8 per cent. Though labeled "installment shares" these thrift accounts were neither understood nor intended to be shares. While they were being issued the association was engaged in its campaign to exchange the old mutual shares for investment certificates in order to avoid a tax liability which was thought to be consequent upon the existence of mutual shares. And when in 1927 the association was assessed a federal tax on the theory that its depositors were mutual shareholders receiving dividends out of earnings, the association indicated its attitude toward the thrift accounts by its successful contention in a controversy with the federal taxing authorities that these "shares" as well as the old mutual shares were in reality borrowed capital, and the profits disbursed thereon merely interest, deductible from gross income in the same manner as interest on investment certificates. Holders of thrift accounts were allowed over the years, as were holders of the old mutual shares, to convert them into the investment certificate form whenever they desired, and for all practical purposes they were treated as interchangeable with investment certificates. Moreover, the thrift accounts were not accorded "full participation in the profits" as then required of "installment shares" by section 634a of the Civil Code, but, instead, were limited to a fixed maximum return of 8 per cent.

The association encountered financial difficulty in 1931 and on January 23, 1933, the Building and Loan Commissioner took over the association for the purpose of liquidation under the Building and Loan Association Act. (Stats. 1931, p. 483; Deering's Gen. Laws, Act 986.) Thereafter the plaintiffs filed their claims with the commissioner asserting the right to share equally in the proceeds of liquidation with the investment certificate holders. Their claims having been rejected by the commissioner, plaintiffs instituted this action. The trial court found for the plaintiffs, concluding that since they were on an equal basis with the investment certificate holders prior to liquidation, they should share ratably with them in the proceeds of such liquidation.

When the association went into liquidation in January, 1933, the Building and Loan Association Act provided that the commissioner should first pay all claims "other than to shareholders and stockholders, without distinction or preference as between the claims of certificate holders and other creditors." (Act, sec. 13.16.) By a statute which became effective August 29, 1933, the act was amended to provide that "notwithstanding anything to the contrary herein contained, in the case of any association in which shareholders shall have heretofore been granted the right and option by the association to exchange their shares for investment certificates of equal value he shall distribute and pay dividends in liquidation to such shareholders without distinction or preference as between the claims of such shareholders and the claims of certificate holders and other creditors." (Stats. 1933, p. 2721; Deering's Gen. Laws (1937), Act 986, sec. 13.16.) An urgency clause was also enacted which provided: "There are numerous building and loan associations now, at the present time, in the process of liquidation and in order that shareholders in such associations shall be assured of full and complete protection by allowing them under the conditions set forth in this act to participate ratably with investment certificates . . . it is absolutely essential that this act take effect immediately and its provisions made immediately applicable to associations now in the process of liquidation." (Stats. 1933, p. 2723.) ▉ This statute was clearly intended by the legislature to apply to cases such as the present one, and under it the plaintiffs are entitled to share ratably with holders of investment certificates since they hold shares

which were exchangeable for such certificates. The commissioner contends, however, that to accord a retroactive effect to the 1933 amendment and make it applicable to an association then in process of liquidation would constitute an impairment of the obligation of contract and an interference with vested rights in violation of both the state and federal constitutions.

We do not find it necessary to determine the correctness of this contention, for it is the opinion of this court that even under the statute as it read prior to 1933, the plaintiffs would not have been treated as "shareholders" but as persons similarly situated to holders of investment certificates and entitled to share equally with them on liquidation. ▮ While an intention to change the law is usually inferred from a material change in the language of the statute (*People* v. *Weitzel,* 201 Cal. 116, 118 [255 Pac. 792, 52 A. L. R. 811]; *Meyerfeld* v. *South San Joaquin Irr. Dist.,* 3 Cal. (2d) 409, 417 [45 Pac. (2d) 321]; *Loew's Inc.* v. *Byram,* 11 Cal. (2d) 746 [82 Pac. (2d) 1]), a consideration of the surrounding circumstances may indicate, on the other hand, that the amendment was merely the result of a legislative attempt to clarify the true meaning of the statute. (See *Union League Club* v. *Johnson, ante,* pp. 275, 279 [115 Pac. (2d) 425]; 59 C. J. 1098; 2 Sutherland, Statutory Construction, p. 777.) It is true that in *Gallichotte* v. *California Mut. B. & L. Ass'n,* 23 Cal. App. (2d) 570, 579 [74 Pac. (2d) 73, 535], another amendment of the same section was held not to be a mere clarifying amendment. In that case the plaintiff had instituted an action for damages against the association prior to the time of taking possession of its assets by the commissioner, at which time the statute required "all claims of creditors" to be presented to the commissioner within a fixed time or to be "forever barred." The commissioner did not mail a copy of the notice to file claims to the plaintiff. He was served with a memorandum to set the cause for trial and did in fact carry on the defense of the action at the first trial in the name of the association. Meanwhile the statute was amended to require the filing of claims even where a suit was pending prior to liquidation, and on the second trial the commissioner pleaded that the plaintiff's failure to file a claim had barred his recovery. The court correctly held, particularly in view of the practical construction given the statute by the commis-

sioner himself, that the plaintiff was not required to file a claim under the statute as it read prior to the amendment.

The instant case arises under entirely different circumstances. Prior to 1924, the old mutual shares were clearly proprietary in nature. Then the association was reorganized as a guarantee stock association. Practical voting control passed to the holders of the guarantee stock. Prior reserves were distributed to the old shareholders. A fixed rate of return equal to that on investment certificates was provided. A policy of exchanging the shares for investment certificates was instituted and, in fact, approximately 95 per cent of the shares were so exchanged. Association officers and shareholders alike understood the shares to be on an equal basis with investment certificates and they were so treated in the association balance sheet. By its settled policy, the association accorded these shares equal rank with investment certificates, and it is clear that even under the statute as it read in 1931, this court would not in equitable proceedings of this nature have disregarded that policy and treated the plaintiffs as ''shareholders'' subordinate in liquidation to investment certificate holders. In such a situation no particular significance should attach to the label given plaintiffs' investments and the court should be guided by the substance rather than the form of the investment. (cf. *Intermountain B. & L. Assn.* v. *Gallegos,* 78 Fed. (2d) 972, 981; *Savannah etc. L. & B. Co.* v. *Silverberg,* 108 Ga. 281 [33 S. E. 908, 911] ; *Helvering* v. *Richmond F. & P. R. Co.,* 90 Fed. (2d) 971; *In re National B., L. & Prov. Assn.,* 12 Del. Ch. 93 [107 Atl. 453, 456] ; 11 Fletcher, Corporations, p. 719, sec. 5294.) Our recent opinion, *In re Pacific Coast Building-Loan Assn.,* 15 Cal. (2d) 134 [99 Pac. (2d) 251], sets forth the guiding principle that the complicated relationships arising from the affairs of a building and loan association should normally be determined only by an examination of the organization, structure and operations of the particular association in the light of the governing statutes, articles of incorporation and by-laws, and not merely by reference to the labels attached to the various interests. The holders of membership shares in that case were in a much less favorable position than the plaintiffs herein, but they were, nevertheless, held to be creditors and entitled to payment of the principal of their claims before payment

of interest accruing after liquidation to holders of investment certificates.

The thrift accounts also were accorded such an equality of treatment with investment certificates before liquidation that it could not have been the legislative intention to defer one to the other during liquidation. Although these shares were issued after the reorganization of the association, they were not sold with the intention of creating a class of membership shareholders such as those involved in the Pacific Coast case. Instead, they were offered by the association as identical with other accounts for the purchase of investment certificates. As in the case of the old mutual shares, they were regarded by the association officers and the investors as of equal rank with the investment certificates, were so treated on the balance sheet and in tax negotiations, and were exchangeable for such certificates. In substance, if not in name, they are investment certificates and not shares, and would have been so treated under the prior statute.

The judgment is affirmed.

Shenk, J., Edmonds, J., Carter, J., and Traynor, J., concurred.

I concur in the judgment. Curtis, J.