[Sac. No. 5506.   In Bank.   Apr. 3, 1944.]

STANDARD OIL COMPANY OF CALIFORNIA (a Corporation), Respondent, v. CHARLES G. JOHNSON, as Treasurer, etc., Appellant.

Earl Warren, Attorney General, H. H. Linney, Assistant Attorney General, and Adrian A. Kragen, Deputy Attorney General, for Appellant.

Pillsbury, Madison & Sutro and Harry H. McElroy for Respondent.

GIBSON, C. J.—Plaintiff brought this action against defendant, as Treasurer of the State of California, to recover with interest a retail sales tax in the sum of $120,196.78, paid under protest. At trial evidence was received in the form of a stipulation of all facts. Judgment was for plaintiff and defendant has appealed therefrom.

The tax assessment was based upon sales of fuel oil by plaintiff to the Southern Pacific Company (hereinafter called the railroad) from March 16, 1936, to March 31, 1937, inclusive, pursuant to a contract entered into on January 1, 1928, as amended January 1, 1936. Under the terms of the amended contract, which covers all sales involved herein, plaintiff agreed to sell to the railroad fuel oil required for its operations in the states of Oregon, Nevada, Arizona, Utah and elsewhere. It was provided, among other things, that: "Requisition by the Railroad . . . shall be filled by the Oil Company by deliveries at such places as are herein specified, and at such times as the Railroad may reasonably designate." If further provided that "oil required by the Railroad for its operations in the States of Nevada and Utah shall be delivered at Sparks, Nevada, oil required by the Railroad for its operations in the States of Arizona and New Mexico, other than

that delivered at El Paso, Texas, shall be delivered at Yuma, Arizona, and oil required by the Railroad for its operations in the State of Oregon, other than delivered at Willbridge, or transported to Portland by the Railroad, shall be delivered at Ashland, Oregon, or Klamath Falls, Oregon, as the Railroad may direct. Oil for such deliveries shall be shipped by the Oil Company in such quantities as the Railroads may designate from time to time from the points of shipment above mentioned, Tracy, Los Angeles, Richmond and Kern River Oil Field. . . .

"The prices to be paid by Railroad for fuel oil delivered under the terms of this contract at Sparks, Nevada; Yuma, Arizona; Ashland, Oregon, and Klamath Falls, Oregon, shall be the prices payable hereunder for delivery at the point of shipment thereof hereinabove specified, plus the current rail freight between such point of shipment and such point of delivery."

Oil was to be accepted or rejected by the railroad "at the time of tender of delivery," and all samples for inspection purposes were to be taken "at time of delivery from the pipe line from which delivery is made or from the storage tank and or tank cars into which delivery is made. . . ." Measurement "for quantity of deliveries to the Railroad" was to be taken "in the Railroad's tank cars and tanks into which delivery is made. . . ." Tank cars were to be furnished by the railroad and placed for loading without cost to plaintiff, and plaintiff was not to be liable for demurrage if cars were promptly loaded or if delay in loading was due to causes beyond its reasonable control.

Pursuant to the contract the railroad ordered fuel oil from plaintiff "giving shipping directions that said oil should be shipped to Southern Pacific Company or its agents or employees at the respective intended destinations" in Oregon, Nevada, Arizona and Utah. The oil was loaded into tank cars of the railroad at various California points and was "transported with tariff rate charges prepaid by plaintiff under the usual standard commercial railroad bills of lading issued to it specifying as destinations the respective points in the states of Oregon, Nevada, Arizona or Utah specified in said orders, and was delivered at such points outside California so denoted in accordance with said bills of lading." The oil was consumed by the railroad in its

operations in those states. Attached as exhibits to the stipulation are copies of "typical" bills of lading naming the Southern Pacific Company as consignee, freight bills for prepaid charges and statements of freight paid. The oil was ordered "f.o.b. points of destination as indicated in said bills of lading." The head office of plaintiff and the main railroad operating office of the Southern Pacific Company were located in San Francisco, and all transactions and payments were handled there.

It further appears from the stipulation that crude oil had never been produced in commercial quantities in Oregon, Nevada, Arizona or Utah, that fuel oil there used "had necessarily to be obtained from sources outside said states," and that deliveries under the contract were "necessarily made from sources of production of plaintiff within the State of California." It is specifically stated that: "There was no practical means of transporting the fuel oil in question from plaintiff's points of manufacture in California to the points of storage of Southern Pacific Company outside said states other than the railroad lines of said Southern Pacific Company."

The Board of Equalization assessed a retail sales tax against plaintiff based upon the above sales. Plaintiff paid the tax under protest and thereafter filed this action for refund. Plaintiff contends that the tax should not have been assessed because the sales either were made outside of California or were sales in interstate commerce and therefore not taxable under the Constitution of the United States or under California tax laws. Defendant contends that the sales were intrastate, completed upon transfer of the oil to the tank cars in California and, further, that even if the sales were made in interstate commerce, the tax was not discriminatory and would therefore not be prohibited under the federal Constitution.

The Retail Sales Tax Act of 1933, as amended in 1935, imposed a tax upon retailers based upon gross receipts "from the sale of all tangible personal property sold at retail in this State." (Stats. 1933, p. 2599; Deering's Gen. Laws, 1935 Supp., Act 8493, § 3.) Section 2(i) of the act defined "in this State" to mean "within the exterior limits of the State of California. . . ." Section 2(b) provided that: " 'Sale' means any transfer of title or possession, or both,

exchange, barter, lease or rental, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property. . . ."

Ruling No. 26 of the Sales Tax Rules and Regulations of the Board of Equalization which applied at the times here involved provided: "The California sales tax does not apply to gross receipts from sales made in interstate or foreign commerce. . . .

"If tangible personal property, pursuant to a contract of sale, is delivered by the retailer at a point outside the State, or is delivered by the retailer to a carrier consigned to a bona fide consignee at a point outside the State and the property is transported and delivered outside the State, the transaction is one in interstate or foreign commerce and the gross receipts from the sale of such property are not taxable.

"If tangible personal property is sold and delivered to the purchaser or his representative in this State, the gross receipts from the sale of the property are taxable, even though the disclosed or undisclosed intention of the purchaser is to transport the property outside the State and the property is subsequently transported outside the "State." (On April 1, 1937, Ruling No. 26 was revised in form but the substance thereof remained unchanged insofar as pertinent here.)

Under the provisions of the statute and Ruling No. 26, the validity of which is not disputed, sales were not taxable unless there was a "transfer of title or possession, or both" in California, or unless the property was "sold and delivered to the purchaser or his representative in this State." In the present case the contract required plaintiff to fill the railroad's requisitions "by deliveries at such places as are herein specified," and oil required for the operations of the railroad in Oregon, Nevada, Arizona and Utah, was to be delivered at named points outside of California. The oil was delivered to the railroad, a common carrier, and was shipped to the out-of-state destinations under standard bills of lading with the buyer named as consignee and with freight charges prepaid by the plaintiff. ▆ Whether or not delivery to a carrier constitutes delivery to the buyer depends upon the intention of the parties as ascertained from the contract and the other circumstances of the case, and ordinarily, unless a contrary intent appears, where the seller contracts to deliver

goods at a given destination and he delivers them to a carrier consigned to the buyer with freight charges paid by the seller (f.o.b. point of destination), the delivery to the carrier does not constitute delivery to the buyer and title does not pass until the goods have arrived at their destination. (See *Lewis* v. *Farmers Grain etc. Co.,* 52 Cal.App. 211, 214 [198 P. 426]; 1 Williston on Sales [2d ed. 1924] §§ 280-280b; 46 Am.Jur. 349-350, 609; 101 A.L.R. 292, 295 et seq.; *cf.* Civ. Code §§ 1738, 1739 [rule 5], 1766; Sales Tax Ruling No. 26, *supra.*) The rule is based upon the theory that in such event the carrier is made the agent of the seller, not the buyer, in transporting the property.

Counsel for defendant concede that no tax would be due if the shipments had been made over the rail lines of a different common carrier, but it is contended, in effect, that because the carrier which received the oil in California was also the buyer, there was necessarily an actual delivery in California to the railroad *as buyer* instead of delivery to it in its capacity as a common carrier. We cannot hold as a matter of law, however, that regardless of the intent and conduct of the parties a taxable sale took place in California rather than in another jurisdiction because of the one circumstance that the parties did not select a carrier other than the railroad of the buyer. As plaintiff points out, it was purely fortuitous, and not a necessary part of the sales transaction, that the buyer was also the carrier, and here it is apparent from the stipulation of facts that the railroad of the buyer was chosen because there "was no practical means of transporting the fuel oil . . . other than the railroad lines of said Southern Pacific Company." Moreover, under the laws governing common carriers, the railroad is required to accept all goods tendered to it for carriage that it is able to carry, and it could not legally refuse to carry goods *as property of the shipper* if the goods were tendered to it for this purpose. In this case it is clear that the shipper tendered the oil to the railroad under such terms, and it is immaterial that the railroad was operated by the buyer of the oil.

In our opinion the terms of the contract and the circumstances under which the oil was shipped clearly disclose an intent that the railroad in its capacity as common carrier receive the oil at the point of shipment as property of the

seller, and that delivery to the railroad *as buyer* should not take place until the oil arrives at its destination outside California. Defendant urges that a contrary intent is disclosed by the provisions in the contract relating to demurrage charges, inspection, acceptance or rejection by the buyer "at time of tender of delivery," and measurement "for quantity of deliveries to the Railroad . . . in the Railroad's tank cars and tanks into which delivery is made." These provisions, however, do not show that either acceptance of the oil, or delivery to the railroad *as buyer*, took place in California, as defendant argues, and any possible inference that such was intended or done is dispelled by the specific provision in the contract that delivery was to be made at designated points outside this state and by the fact that the shipments were actually made f.o.b. such destinations. Further, had the parties intended a completed sale and delivery to the buyer upon loading of the oil on tank cars in California, it would have been sufficient to provide in the contract for delivery f.o.b. the shipping point. Had such been their intent, it is unlikely that they would have gone through the unnecessary procedure of shipping the oil consigned to the buyer out of state under commercial bills of lading issued to the seller with freight charges prepaid by the seller.

Defendant contends, next, that the terms of the contract and the form of the shipping documents must be disregarded upon the ground that the whole purpose of making the delivery ostensibly f.o.b. destination outside of California instead of f.o.b. the tank cars was to avoid the payment of sales taxes to the State of California. In support of this contention· defendant urges that there was no actual difference in fact between the situation here and the situation as it existed under the 1928 contract, when the sales were designated f.o.b. tank cars. There are, however, material differences. Although it is true, as defendant asserts, that the freight charges prepaid by the seller under the 1936 contract were added to the sales price, the seller was deprived of the use of the money paid for freight until the oil was paid for by the buyer. Also, under the 1936 contract, risk of loss during transportation was upon the seller, as owner, rather than the buyer. Defendant argues that the railroad bore the risk of loss during transit because of sections 2194 and 2195 of the Civil Code which assertedly made it an insurer

of property entrusted to it. These sections, however, do not make the carrier an insurer against all losses; they make certain exceptions including injury caused by acts of a public enemy, acts "of the law," and any "irresistible superhuman cause." Risk of loss from such a cause remains with the owner of the property. Further, as heretofore said, the time when title passes and whether or not delivery to a carrier constitutes delivery to the buyer depends upon the intent of the parties, and, therefore, the form of the dealings between them cannot be disregarded. The parties are, of course, free to set up their transaction, if bona fide, so as not to be within the taxing statute, and there is nothing in the record which indicates that the contract here is not bona fide.

■ It is our conclusion, therefore, that the sales of fuel oil involved in this action were not made in California within the meaning of the Retail Sales Tax Act of 1933 or Ruling No. 26 of the Sales Tax Rules and Regulations of the Board of Equalization.

That the transactions were not subject to the tax is further indicated by the 1943 amendment to the Revenue and Taxation Code which added section 6385 specifically exempting all sales of this type. (Stats. 1943, p. 2457.) The section provides: "There are exempted from the computation of the amount of the sales tax the gross receipts from sales of tangible personal property to a common carrier, shipped by the seller via the purchasing carrier under a bill of lading whether the freight is paid in advance, or the shipment is made freight charges collect, to a point outside this State and the property is actually transported to the out-of-state destination for use by the carrier in the conduct of its business as a common carrier." That this court may consider the 1943 amendment in determining the scope of the tax statute at the time of the transactions here involved is indicated by *Union League Club* v. *Johnson*, 18 Cal.2d 275, 278-279 [115 P.2d 425]. It was there held that in view of an amendment to the Retail Sales Tax Act at a time when certain groups were resisting collection of taxes assessed against them, the court could infer a legislative intent to clarify rather than to change existing law. (See, also, *San Joaquin Ginning Co.* v. *McColgan*, 20 Cal.2d 254, 264 [125 P.2d 36]; *Martin* v. *California Mut. B. & L. Assn.*, 18 Cal.2d 478, 484 [116 P.2d 71].) Similarly, the 1943 amendment was made while the instant case was pending upon appeal

and after the decision in *Standard Oil Co.* v. *Johnson,* 56 Cal.App.2d 411 [132 P.2d 910], which held that the sales tax act applied to sales of oil to a carrier for use outside the state but delivered f.o.b. tank cars of the carrier in California.

The authorities cited by defendant do not require a different conclusion. *Barker Bros. Inc.* v. *Los Angeles,* 10 Cal. 2d 603 [76 P.2d 97], involved a municipal ordinance purporting to tax gross annual receipts of certain stores, and there was no discussion of the state Retail Sales Tax Act or Ruling No. 26, *supra. Department of Treasury* v. *Wood Preserving Corp.,* 313 U.S. 62 [61 S.Ct. 885, 85 L.Ed. 1188], involved the legality of taxes laid by the State of Indiana upon gross receipts from sales to a railroad of ties which were accepted in Indiana by an inspector of the railroad and were there loaded under bills of lading naming as consignee the railroad's chief engineer in Ohio. No freight charges were paid for the transportation. The court in holding that Indiana had not exceeded its constitutional authority by taxing interstate commerce stated that the transactions were local sales and deliveries in Indiana because, among other things, the ties were there accepted by an inspector of the railroad. It also said that the seller "did not pay the freight for that transportation and the circumstance that the billing was in its name as consignor is not of consequence in the light of the facts showing the completed delivery to the Railroad Company in Indiana." (313 U.S. at p. 68.) The contract provided for delivery of the ties "f.o.b. cars on the railroad tracks," whereas the contract in the present case required delivery at points outside the state. The cases are therefore distinguishable on the facts. The case of *McGoldrick* v. *Berwind-White Coal Mining Co.,* 309 U.S. 33 [60 S.Ct. 388, 84 L.Ed. 565, 128 A.L.R. 876], is not in point. There goods were delivered in New York City by the seller, a Pennsylvania corporation. The question involved was whether New York, the state of the *buyer* (state of destination) had *power* under the federal Constitution to impose a sales tax. We, of course, are not concerned with powers of the states of Oregon, Nevada, Arizona, or Utah to tax the sales involved here. Nor is it necessary for us to consider the power of California, the state of the seller, to tax interstate commerce. *O'Kane* v. *State,* 283 N.Y. 439 [28 N.E.2d 905], is not in point for the reason that the New

York statute imposed the tax upon "all sales or *agreements to sell*" (p. 907 [28 N.E.2d]), and the court said (p. 909 [28 N.E.2d]): "The taxable event, to wit, the making of the *agreement* for the sale of the property, occurred in this State prior to the transportation of the goods in interstate commere. . . ." (Italics added.) *State Board of Equalization v. Blind Bull Coal Co.*, 55 Wyo. 438 [101 P.2d 70], did not involve a sale to a common carrier, and the purchasers, after receiving the goods in the taxing state, transported them in their own trucks to another state.

The judgment is affirmed.

Shenk, J., Curtis, J., Edmonds, J., Schauer, J., and Spence, J. pro. tem., concurred.

Traynor, J., did not participate.

CARTER, J.—I dissent. The primary issue presented in this case is whether or not there was a sale in California within the terms of the Retail Sales Tax Act. (Stats. 1933, p. 2599; Deering's Gen. Laws, 1937, Act 8493.) It should be noted at the outset that the determination of whether a transaction constitutes a sale under taxing statutes is not necessarily governed by the technical rules applicable between seller and buyer, and that the substance of the transaction rather than its form will be examined. (See *Hellebush* v. *Commissioner of Internal Revenue*, 65 F.2d 902; *Embry Realty Co.* v. *Glenn*, 116 F.2d 682.) In that connection this court has held that it will look through the veil of corporate entity to the actual circumstances in ascertaining whether a corporation is subject to the Bank and Corporation Franchise Tax Act. (See *H. A. S. Loan Service, Inc.* v. *McColgan*, 21 Cal.2d 518 [133 P.2d 391, 145 A.L.R. 349].)

A sale is defined by the Retail Sales Tax Act as "any transfer of title or possession, or both, exchange, barter, lease or rental, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property, for a consideration, and includes the fabrication of tangible personal property for consumers who furnish either directly or indirectly the materials used in the fabrication work and the furnishing, preparing or serving for a consideration of any tangible personal property consumed on the premises of the person furnishing, preparing, or serving such tangible per-

sonal property. A transaction whereby the possession of property is transferred but the seller retains the title as security for the payment of the price shall be deemed a sale.''

In the light of that definition I believe it is clear that the instant transaction constituted a sale in California. (1) Both, the seller, Standard Oil Company of California, and the buyer, Southern Pacific Company, maintain places of business in California. (2) The contract for the sale of the oil was made in California by the contracting parties. (3) The purchase price for the commodity was paid in California. (4) The seller had its oil supply in California. (5) It delivered custody of the oil to the buyer in California. (6) The price paid for the oil transported by the buyer to Nevada, Arizona and Oregon was the same as that charged for deliveries made at the point of shipment plus freight charges. In that connection, however, the seller prepaid the freight charges which were repaid by the buyer. (7) The tank cars required by the buyer ''for receipt of deliveries'' by the seller were furnished by the buyer and placed for loading by the seller, a clear indication that delivery was in fact made in California. The only feature of an ordinary sale in California that might be said to be lacking was, that there was no delivery of the oil in California; that delivery under the contract took place outside of California and hence the sale was made there.

First, there are conflicting provisions in the contract with regard to delivery as seen from the seventh point above mentioned. From that provision it may reasonably be concluded that the legal delivery was in fact made in California when the oil was loaded from the seller's supply depot into the buyer's tank cars. This court may make such an interpretation inasmuch as the interpretation of a contract is one of law where there is no evidence outside the contract.

Second, the substance of the transaction speaks for itself. To accept the language of the contract that there was no delivery until the oil reached a point outside of California, and taking into consideration the purported dual capacity of the buyer, as both a buyer and a common carrier, as being distinct from each other, is to pursue form rather than substance. The facts of the matter are that the possession of the oil was delivered to the buyer in California and that possession was pursuant to a contract of sale. The definition of

a sale in the tax act states that it is a transfer of *possession or title* or both. As between the parties the title may not have passed until the oil passed the California state line, and under the tax act a mere transfer of possession alone may not be taxable. But inasmuch as *title* need not necessarily pass in order to bring the transaction within the tax act, a transfer of possession under and pursuant to a contract of sale certainly constitutes a sale within the meaning of the act. It cannot be doubted that the transfer of possession to the buyer in California was pursuant to the contract of sale. True, the bill of lading and payment of shipping charges by the seller were indicative of a transfer pursuant to a shipping arrangement. But that entire arrangement was set forth and fixed in the contract of sale. Everything in connection with the sale was completed before the oil left California except the anomalous circumstance of the buyer transferring possession from itself as carrier to itself as buyer after the oil arrived at a designated point outside of California. Can it be said that this mere fiction changed the transaction from a taxable to a nontaxable one under the law of California? I think not. Regardless of the rights and obligations of the parties to the contract, as between themselves, the taxing statutes should not be so easily evaded.

In my opinion the judgment should be reversed.

Appellant's petition for a rehearing was denied May 1, 1944. Carter, J., voted for a rehearing.