[S. F. No. 17016. In Bank. Oct. 20, 1944.]

WILLIAM H. PENAAT, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Leo R. Friedman for Petitioner.

Jerold E. Weil for Respondent.

THE COURT.—Petitioner seeks a review and the dismissal of a disciplinary proceeding wherein it has been recommended

that he be suspended from the practice of the law in this state for a period of six months.

The charges are based upon petitioner's alleged solicitation and purported representation under contingent fee contracts of a group or league of claimants of an insolvent building and loan association. The Board of Governors concluded, as ground for suspension, first, that petitioner solicited one claimant in violation of rule 2 of the Rules of Professional conduct, and second, that petitioner violated his oath and duties as an attorney and committed acts involving moral turpitude in: (a) attempting to collect from two claimants legal fees which petitioner knew were not owing to him or to the league for which he was acting as attorney; (b) sending the claimants letters by which petitioner intended to deceive in certain particulars; (c) failing to advise three claimants from whom petitioner collected fees that in addition to such compensation they were liable for fees awarded by the court to attorneys of record in representative actions; and (d) preparing and filing with the State Corporation Division a verified application for a certificate to solicit contingent fee contracts containing material allegations which petitioner knew to be untrue and misleading.

In 1933 there had been filed on behalf of a group of share claimants of an insolvent building and loan association, certain actions designed to establish their right to share, with holders of investment certificates, in liquidating dividends. Trial of the causes in 1935 resulted in a judgment for plaintiffs, from which an appeal was taken. (See *Martin* v. *California Mut. B. & L. Assn.*, 18 Cal.2d 478 [116 P.2d 71].) As these Martin actions were not representative, in the year 1937 another group of claimants retained L. H. Schellbach, et al., as counsel, to institute representative suits in behalf of themselves and all others similarly situated, for the purpose of establishing their right to share in liquidating dividends. (See *Adams* v. *California Mut. B. & L. Assn.*, and *Byl* v. *California Mut. B. & L. Assn.*, 18 Cal.2d 487 [116 P.2d 75].) About this same time one Charles E. Betts told petitioner that he owned a passbook representing a deposit in the association; that a friend, Flynn, was also the owner of a passbook, and that Flynn's sister, Jean Dixon, was a depositor. He proposed the formation of a committee which would be represented by petitioner for the purpose of establishing claims against the asso-

ciation. About June 1, 1937, he purportedly joined with Flynn and Dixon in the organization of the Building and Loan Investors' League, and in the formation of a so-called executive committee of that league.

Petitioner was informed by Flynn and Betts that he was retained as counsel for the league and he accepted that employment. He never met Jean Dixon. Upon information supplied by Flynn and Betts he prepared the documents he deemed necessary to express the purposes of the league and a subscription agreement whereby those joining would agree to pay a sum equal to 5 per cent of their shares in the association to cover expenses of the league, and an additional 15 per cent as counsel fees in the event of recovery. The organizers were to have their own claims handled free of charge and were to receive 2½ per cent of the initial 5 per cent payments, petitioner to retain the other 2½ per cent.

The league, if it actually existed, was never a bona fide organization of holders of membership shares in the association. Betts had no interest in any membership share. Flynn was a security broker who acquired certificates only by transfer. His sister, Jean Dixon, worked in his office and the shares standing in her name were assigned to her in April, 1936, and assigned by her to one Lee not later than October 29, 1937.

The so-called managing body or executive committee of the league was said to consist of Dixon, Mrs. White and Miss Mary S. L. Wilson, of "c/o Anna Head School, 2538 Channing Avenue, Berkeley." The Miss Wilson at that address never had anything to do with the association or parties here involved. Another Miss Wilson of Berkeley, had been solicited by letter, had called at petitioner's office with a friend, and had left without joining the league. Mrs. White was a depositor in the association, but she never heard of the league or executive committee until about the time of distribution of dividends when she received a letter from the commissioner advising her that petitioner claimed a fee. Flynn testified that Mrs. White's husband had authorized the use of her name.

So far as shown no meeting of the league or of the executive committee was ever held, no officers were elected, and no proceedings were taken other than the things done by Betts and petitioner. The Board of Governors found that the league was not a bona fide organization of holders of membership shares

but that petitioner "did not know that said league and said committee were not bona fide."

After the purported organization of the league, Betts continued his work of solicitation, sending out letters from petitioner's San Francisco address, although he also maintained his own office in San Jose. ■ In January, 1938, pursuant to the enactment in 1937 of the Security Owners' Protection Law (Stats. 1937, p. 2232, Deering's Gen. Laws, p. 1787, Act 3815), petitioner prepared and filed with the Division of Corporations, an application signed and verified by Dixon for a certificate of authorization for contingent fee contracts solicited and to be solicited. This application recited that the executive committee of the league was composed of Dixon, White and Miss Wilson of the Head School, all of whom held approved claims against the association; that Dixon and White had consulted petitioner's law firm; that the firm had recommended to them that they institute an action to protect their rights; that since such a proceeding would be rather expensive they determined to affiliate other claimants similarly situated; that with this in mind they formed the league, sought and received the cooperation of other claimants, and retained petitioner's firm as counsel on a contingent fee of 20 per cent of the ultimate recovery. The commissioner refused to issue a certificate on the ground that he was unable to find that the proposed plan was not "unfair, unjust, or inequitable," and would not "work a fraud" upon purchasers. The recitals of the application, the Board of Governors found, were "material and were false and were known to [petitioner] to be false," in many material respects. This finding, under the evidence, is correct. Assuming that there actually was a league, or an executive committee, or that petitioner actually believed in their existence, it was a fact, which he knew, that neither Dixon nor White had ever met him personally or consulted with him or his law firm. For an attorney to properly give advice to clients relative to the formation of a league, and the committee of a league, and its affiliation of other members, the attorney should know who his clients are, and not misrepresent to the Corporation Commissioner that he has consulted with the clients and advised them in certain particulars, when he knows the statement is not true.

A few months after formation of the league, in September and November of 1937, the two representative suits, Adams

and Byl, *supra,* were filed, and in each a request was made for an allowance of counsel fees for attorneys of 'record for the named plaintiffs therein and others of similar status who would benefit in the event of successful prosecution of the litigation. Petitioner admittedly knew at all times of the pendency of these suits, but claims that he did not know of the prayer for and granting of counsel fees until after the final decision on appeal, and hence did not know that some members of the league would be liable for such fees. He testified that a copy of the complaint which he borrowed from attorney Schellbach did not contain a prayer for fees, and that he never examined the record in the courthouse. He said that he had prepared a complaint on behalf of league members, but had never filed it as he decided instead to watch the progress of the pending suits.

In describing the services rendered for league members, other than those already mentioned, petitioner testified. that he investigated court proceedings, had six or eight telephone conversations and one or two personal interviews with the original attorney for the commissioner; talked with a man in the office of counsel handling the Martin cases; saw Mr. Schellbach twice and talked with a man in his office; talked with the attorney who represented the commissioner in the later stage of proceedings; did quite a bit of legal research; examined the Martin files and glanced through the Adams and Byl files in Mr. Schellbach's office. The board found that petitioner "did not file any suit on behalf of the members of said league, but did investigate and kept himself informed concerning the progress of the litigation that would be determinative of the rights of the members of said league." Petitioner asserts that a "mere reading of the findings is apt to lead to the conclusion that [he] performed no services for members of the league, but a reading of [his] testimony completely refutes such a conclusion." The record shows, however, that the findings give petitioner the benefit of every inference or implication to which he is entitled with respect to the rendition of services. Other than taking steps to put in motion the procedure by which he might obtain contingent fee contracts and gain the advantage of solicitation work done by Betts, petitioner, so far as shown, did nothing other than to follow the course of pending litigation, and upon its successful termi-

nation undertook to collect such fees as it was possible for him to secure.

Within a few months after creation of the league, the board found, Betts abandoned his activities in connection with it. He did not see petitioner after 1939, and his whereabouts at the time of the hearings herein were unknown. He had delivered to petitioner all agreements signed at his solicitation, and all initial payments had been divided equally between the two. He had also supplied a list of six or eight purported members of the league, other than Flynn, Dixon and White, but had not supplied contracts for some of them; in particular there were no contracts with White, Wilson or Day.

In August, 1941, this court rendered decisions favorable to the plaintiffs in the Martin, Adams and Byl cases, *supra*. Petitioner thereupon consulted with the commissioner relative to requirements for presenting his claim for fees. On October 6, 1941, he sent the attorney for the commissioner a list of the members he claimed to represent, and about two weeks later he mailed his alleged clients a letter reading in part:

''For several years we have been handling the matter of your claim . . . and we are glad to report that the California Supreme Court has finally sustained our position . . . . No effort has been made heretofore to approve the claims of such claimants as yourself, so some form of proof of claim will no doubt be set up . . . and some means of identification, no doubt, required before the dividend distribution will be made . . . We will communicate with you again . . . and will do all we can to get your dividend to you at the earliest possible date. . . .'' The board found, contrary to the finding of the Local Committee, that petitioner intended by this letter to deceive the claimants to whom he addressed it, by ''causing said claimants to believe that the decision on appeal in the Adams and Byl proceedings was due to the efforts of [petitioner] and that [petitioner] had actively participated or rendered services in said litigation.''

A reading of the letter, coupled with a consideration of the representations which had been made upon the solicitation of members and thereafter, is sufficient to show that the finding is supported. A letter of solicitation sent out by Betts had told claimants that the purpose of the league was to as-

sociate the members together "to press their claims in a similar suit"; that "our attorneys are already at work upon the matter." The agreements signed referred among other things to "bringing, maintaining, settling, and compromising such proceedings, and legal actions as may be deemed necessary or advisable to protect my interests," and provided for retention by the attorney of "twenty percent of any recovery obtained by or for me," and that "any costs allowed by the court and collected will be refunded to the subscribers pro rata." In September, 1938, petitioner had written: "We have been following certain litigation which is pending in the Appellate Court, have prepared a suit on behalf of the depositors we represent, including yourself, and ultimately upon the termination of the litigation on appeal we feel confident that a recovery will be had in your behalf. . . ." In the light of these previous assurances and representations the statement in the letter of October 6th, that "For several years we have been handling the matter of your claim . . . and we are glad to report that the California Supreme Court has finally sustained *our position* . . ." could only mean that the successful termination of the litigation was due in some part to the efforts or active participation of petitioner.

On December 9, 1941, the attorney for the commissioner advised petitioner by letter that "some of the shareholders, by virtue of the fact that their rights were established through a representative suit, are burdened with the payment of a prorata share of the attorneys' fees, in the amount 13⅓% of their claims . . .," and for further information the letter referred petitioner to Messrs. Schellbach, et al. The following day petitioner advised the commissioner that he represented eight named clients whose claims aggregated $9,318.03, and on December 20th he again wrote the commissioner saying: "We have a contingent percentage interest in each of the claims . . . in the list that we recently sent to you, and would suggest . . . making the check payable to the shareholders and the attorney, thus necessitating the endorsement of the check by both."

On March 6, 1942, in an effort to get further authorizations, petitioner wrote his alleged clients stating: "The litigation in this matter has finally ended and the . . . Commissioner is about to apply to the court for directions as to distributing the funds . . . His attorney has asked us to procure a letter

from the people whom we are representing which can be deposited in court showing our authorization to make the necessary appearances in your behalf. I am enclosing a letter which I would appreciate your having signed. . . .''

Of the list of eight alleged clients submitted by petitioner, four had never signed subscription agreements, and only one had indicated any willingness to cooperate or join the league. Two others on the list, Robt. and Anna Scholz, protested to the commissioner that although they had signed, it was by misunderstanding as to their ''real representative,'' for they had previously signed up with the Schellbach group. These two, and two others, were liable for counsel fees in the representative suits. The board found that petitioner knew, or in the proper performance of his duties as counsel for the league should have known, of the award by the court of counsel fees to attorneys of record in the representative actions, and that petitioner did not at any time advise the members of the league who were subject to such liability that they would have to pay fees awarded in the representative actions in addition to petitioner's fee.

Petitioner argues that these findings are unsupported because he repeatedly testified to his lack of knowledge or recollection of knowledge of fees in the representative suits until after the decision on appeal when he was advised by the attorney for the commissioner. But even if petitioner was not initially aware of the prayer for and award of fees in the representative suits because of his failure to examine documents of record, he was specifically advised of them by the commissioner's letter of December 9th. Yet he did not mention the matter to his clients, even while soliciting further authorizations from them. To those who failed to reply to his above mentioned letter of March 6th, he sent a follow up about March 19th, saying among other things: ''. . . This case will probably be heard in the very near future and I would appreciate it if you would send the authorization back to me at the earliest possible moment.'' As a result of protests by some of the alleged clients, the commissioner wrote petitioner that unless matters were adjusted at once he would be forced to interplead all parties with whom settlement had not been made. Of the eight alleged clients, three secured a waiver of petitioner's claim, one compromised, one paid under protest, and the other three submitted to his demands. In all he

received an estimated $100 from his 2½ per cent of the initial 5 per cent payments, and between $300 and $400 from the remaining 15 per cent collections.

But petitioner contends that even if he had known of the award of fees in the representative suits, it was not incumbent upon him to advise members of the league as to their liability to pay fees in a suit to which they never voluntarily became parties. The obvious answer is that petitioner's clients were looking to him to protect their interests, and not to be required to pay double fees of 13⅓ per cent to one set of attorneys and 20 per cent to another. This court in the Adams case said (18 Cal.2d 487, 489): "Inasmuch as these are representative actions, brought on behalf of named plaintiffs and others similarly situated but not represented in corresponding litigation, any award of counsel fees should be paid out of that portion of the fund recovered by those for whose benefit these actions were brought." Petitioner, so far as shown, made no effort to either associate himself as counsel of record in the representative suits or to institute "corresponding litigation" on behalf of his clients, but claimed the right to his 20 per cent contingent fee merely for "following" the successful course of the suits prosecuted by others, thus impressing some of his clients with double liability. ▇ In good faith he should have advised them of the facts, so they could have decided whether they wished his additional representation, and should not have misled them by the indefinite tenor of his correspondence on the subject of whether he actually instituted litigation in their behalf.

▇ The board found that it was not true that petitioner solicited employment through Betts but that it was true that he solicited legal employment by Mary E. Wilson, and that under a claim which he knew to be unwarranted he sought to compel the payment of legal fees by Mary E. Wilson, and Cynthia Day, who had not signed subscription agreements or otherwise become obligated either to the league or to him. Petitioner contends that these adverse findings cannot be reconciled with findings in his favor to the effect that he did not know that the league and committee were not bona fide; that he did not solicit through Betts; that "among the holders of membership shares solicited by Betts by letter was Mary Estelle Wilson . . ."; and that it was after the solici-

tation by Betts that Miss Wilson had her first contact and conversation with petitioner.

But the evidence shows that when Miss Wilson and a friend called on petitioner in response to the Betts letter, they "merely told him after listening we would let him know later, and when we got outside we both agreed we did not think he had to offer what the other group in San Jose had to offer, and that ended the matter." Notwithstanding this, petitioner claims he believed that as a result of the interview Miss Wilson had retained him. When asked: "Referring to the two depositors, White and Wilson, weren't you interested in determining in some more exact fashion than just the statement from Mr. Betts what clients you represented in this matter?", petitioner replied, "Well, I thought it was a bit odd there weren't contracts from them but I assumed in the confusion and handling of these various papers he had misplaced them or lost them, and there would be no reason for me to have the names on the list unless he had at one time contracts from them." Although petitioner never saw Betts after 1939, he continued until the spring of 1942, to assert his claims for fees against Miss Wilson and the other alleged clients.

The record shows ample support for the findings and conclusions of the board, and no good reason has been advanced for refusing to follow its recommendation.

It is ordered that petitioner be and he is hereby suspended from the practice of the law for six months, this order to become effective thirty days from the filing of this decision.