[No. B123313. Second Dist., Div. Four. Mar. 8, 2002.]

AMERICAN AIRLINES, INC., Plaintiff and Appellant, v.
SHEPPARD, MULLIN, RICHTER & HAMPTON et al., Defendants and
Appellants.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I.B and I.C and II.B through II.D of the Discussion.

**COUNSEL**

Lurie & Zepeda, Kurt L. Schmalz, L. Kimberly Pepper and Donna M. Dean for Plaintiff and Appellant.

Munger, Tolles & Olson, Brad D. Brian, Rita J. Miller and Steven W. Hawkins for Defendants and Appellants.

**OPINION**

**VOGEL (C. S.), P. J.—**

## INTRODUCTION

In 1990, plaintiff American Airlines, Inc. (American) retained defendants Gregory A. Long (Long) and his law firm, Sheppard, Mullin, Richter & Hampton (SMRH), to represent it regarding a specific model of aircraft it contracted to purchase from McDonnell Douglas Corporation (MDC). After 1990, ADO Finance A.G. (ADO), another purchaser of the same model of aircraft from MDC, commenced suit against MDC asserting the aircraft did not meet specifications. In pursuit of its claims against MDC, ADO initiated discovery to obtain production of documents related to American's contract with MDC. American engaged defendants to represent it in connection with the discovery proceeding in the ADO/MDC lawsuit. Defendants, over American's objection, accepted employment with ADO whereby Long would serve as ADO's designated deposition witness. American participated in the deposition, objected to Long's involvement, and Long was eventually disqualified.

American sued defendants on various theories, contending that defendants accepted representation that was adverse to American. The matter ultimately was tried, and a jury found defendants liable for breach of fiduciary duty and professional negligence.

On appeal, American contends that the trial court erred in the following particulars: (1) granting a motion for summary adjudication on its claim for punitive damages; (2) striking various claims from American's complaint; (3) limiting the evidence with regard to the damages awardable to American; and (4) awarding costs and expert witness fees to defendants based on American's refusal of a Code of Civil Procedure section 998 offer of settlement.

Defendants filed a cross-appeal, contending that the evidence did not, as a matter of law, support the jury's verdict finding them liable for breach of fiduciary duty. They further contend that the damages awarded constituted an improper award of attorney fees.

In the published portions of this opinion, we conclude: (1) as a matter of law, the evidence supported the jury's finding that defendants breached their fiduciary duty (pt. I.A); (2) however, there existed no triable issues of material fact which would support a finding by clear and convincing evidence that defendants should be held liable for punitive damages (pt. II.A); and (3) Code of Civil Procedure section 998 requires under the circumstances present here that defendants recover their costs incurred after plaintiff rejected their settlement offer (pt. II.E). In the unpublished portions of this opinion (pts. I.B and I.C and II.B through II.D), we find no reversible error as to the remaining contentions raised by the parties. Accordingly, we affirm the judgment and the postjudgment award of costs.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 1989, American entered into an agreement with MDC to purchase MD-11 aircraft. In July 1990, dissatisfied with the performance of the aircraft and particularly with how much weight it could carry and how far it could fly without refueling (its "payload capacity" and "range"), American hired Long and SMRH to advise it with regard to whether it had claims or remedies against MDC with respect to its purchase of the MD-11's. Long drafted a complaint against MDC for fraud and breach of contract, but the complaint was never filed.

During late 1992 and 1993, American entered into settlement discussions with MDC. Long participated minimally in reviewing and revising "letter

agreements" on behalf of American, by which MDC was required to fix specific problems with the MD-11's on an ongoing basis. The settlement ultimately reached was confidential, and both parties were prohibited from releasing the settlement documents or disclosing the terms of the settlement to third parties. Long and SMRH were not informed of the final resolution of the matter or the settlement terms.

In May 1993, ADO, a Swiss aircraft broker, filed a civil action against MDC in United States District Court, alleging MDC had failed to deliver MD-11 aircraft capable of performing according to the representations made by MDC as to payload capacity and range. ADO was represented in the matter by James Wawro, Anthony Russo, and their law firm Morgan, Lewis & Bockius (MLB).

When the ADO suit was pending, Long and SMRH were representing MLB, Wawro, and Russo in unrelated litigation.[1] Wawro and Russo eventually were dismissed as individual defendants in that action on January 7, 1994, although representation of MLB continued thereafter.

In the latter part of 1993, Long and Wawro discussed Wawro's representation of ADO against MDC. Wawro knew Long previously had represented Continental Airlines in litigation against MDC. In October 1993, at Wawro's request, Long sent him copies of discovery requests Long had used representing Continental Airlines against MDC. Wawro also asked for and received Long's advice on potential expert witnesses to use in the ADO litigation. Wawro testified at his deposition: "I think [Long] mentioned that he represented American Airlines in 1991." Wawro did not recall Long mentioning at that time that his representation of American was in connection with the MD-11 aircraft.

In early February 1994, the discovery master in the ADO litigation ordered MDC to produce to ADO some documents related to American's dealings with MDC regarding the MD-11. As a courtesy to American, occasioned by the fact MLB represented American in other unrelated matters, American was allowed to review the MDC documents in advance of their production.[2] After American learned of the court order for production by MDC of confidential, American-related documents, it asked Long on January 28, 1994, to advise it in connection with the document request, and to oppose the production of documents as appropriate.

---

[1] Long and SMRH defended MLB in various unrelated legal malpractice litigation throughout the period of 1991 to 1996.

[2] American told Long that MLB did substantial work for American and that American might seek MLB's disqualification; it never did so. Wawro did not think the Los Angeles office of MLB represented American, rather that the Washington and maybe Philadelphia offices did.

Long accepted American's engagement and from February 1994 to July 1995, Long personally spent 40 hours reviewing American documents subject to production in the ADO litigation. Long prepared indices of those documents, and he gave Wawro at least some of these indices to obtain MLB's agreement to avoid or limit production of all or some of American's documents. The documents eventually produced by MDC were subject to a protective order that included an "attorney's eyes only" provision.

Long completed his review of the American-related documents in July 1995. He did not receive any additional work from American with regard to the ADO litigation until early February 1996.

Sometime during the second half of 1995, ADO's lawyers mentioned to Long the *possibility* of his being a Federal Rules of Civil Procedure rule 30(b)(6) (28 U.S.C.) witness for ADO without specifically asking him to do so.[3]

Around February 6, 1996, the magistrate in the ADO litigation ordered ADO to designate a federal rule 30(b)(6) witness; the individual previously designated by ADO to testify in that role had been unable to answer many of the questions asked by MDC. ADO had no employees who could serve that purpose, so MLB immediately created a list of 10 to 15 candidates who might serve as its designee, one of whom was Long.

On February 15, 1996, Wawro called Long and asked him to determine whether American would voluntarily produce documents to ADO or consent to being served in California with a document subpoena. Long relayed the inquiry to American on that date. Kathryn Koorenny, in-house counsel for American, believed MLB did not need American's consent to serve a subpoena, but told Long that American would not volunteer to accept service in California. She asked Long to advise her on whether American should prepare some legal strategy to prevent or limit ADO's obtaining American's documents, many of which she characterized as confidential and proprietary.

On February 21, 1996, following a telephone conversation with Koorenny, Long dictated a letter to Wawro regarding American's position concerning production of its documents. The letter was transcribed and sent on February 23, 1996. The letter stated: "American is willing to accept a subpoena served on CT Corporation, its registered agent for the service of process in the State

---

[3]As we will discuss, the function of such a witness is to testify on behalf of a corporation or other organization as to matters known or reasonably available to the organization, and specifically as to those matters described in the deposition notice. All further references to federal rule 30(b)(6) are to the Federal Rules of Civil Procedure (28 U.S.C.).

of California. It does so with the understanding that you will discuss with American any objections that it might have to the subpoena duces tecum and, if those objections cannot be resolved to American's satisfaction, ADO will withdraw the California subpoena. Following[] that, ADO agrees to obtain a new subpoena directed to American Airlines from the United States District Court in Fort Worth, Texas and to serve the subpoena in Texas." Thereafter, Long told Koorenny that ADO had agreed not to subpoena American's documents "for now."[4]

No later than February 20, 1996, Wawro asked Long to serve as the federal rule 30(b)(6) witness for ADO in its litigation against MDC. At trial Long was asked when in 1996 did Wawro first talk to him about being a rule 30(b)(6) witness. He replied that it was the 20th or 21st of February, but not before the 20th, "[b]ecause I know that we reached the conclusion of my go between services with Morgan Lewis on the one hand and American Airline [*sic*] on the other before he raised that issue." Wawro testified at trial that it was 10 days to 2 weeks after the magistrate ruled on February 6th that ADO had to produce another rule 30(b)(6) deponent before he spoke to Long about serving in that capacity.

On February 20, 1996, a letter was sent by telecopier, from Wawro to a Carl Stadelhofer in Switzerland, "confirm[ing] your advice that ADO desires to retain Gregory A. Long . . . to act on its behalf as ADO's federal rule 30(b)(6) deponent. Unless you advise differently immediately, I will proceed to get Greg started on this project." Also on February 20, Wawro sent Long a letter by messenger enclosing the rule 30(b)(6) deposition notice, ADO's first amended complaint, and various other pleadings, noting, "Let's discuss when you have a chance."

During the last few days of February or early March 1996, Long told Koorenny that ADO had asked him to be its federal rule 30(b)(6) witness. Koorenny said she would speak to her supervisor, David Schwarte, about whether American would agree to waive the conflict of interest. Long and Koorenny had several conversations about the possibility of Long's serving as ADO's rule 30(b)(6) spokesperson. Koorenny expressed concern that Long could be disqualified from doing future work for American in the ADO litigation, and that he could reveal confidential information. She expressed the concern on behalf of American that MDC would take the position, if American consented to Long's testifying on behalf of ADO, that American had waived its attorney-client privilege.

---

[4]On February 16, 1996, however, ADO had served on MDC a sixth request for production of documents, seeking additional American-related documents created through March 19, 1996.

Long told Russo of MLB that American's concern was that it might need Long's services in the future if subpoenaed by ADO. In response ADO told Long it would agree not to subpoena American. Long said American also was concerned that MDC might subpoena American's documents. American therefore wanted a waiver from ADO to allow Long to respond to a subpoena from MDC and for ADO to waive any objection based on Long's service as ADO's federal rule 30(b)(6) witness. ADO signed a waiver letter, which Long sent to Koorenny on March 7, 1996.[5] The letter waived any conflicts and consented to Long's representation of American, but it did not include the oral representation of ADO's counsel to Long that ADO would not serve a subpoena or document request on American in the future. Koorenny did not understand at that time that ADO had agreed never to subpoena American's documents, but rather she understood that it might do so in the future. Before then, ADO's attorneys apparently had told Long they would not enforce a subpoena served on American if American objected but, according to Koorenny, Long did not share that information with American. Koorenny was concerned about the waiver letter's inclusion of the following reference: "similar issues may arise in the future because of document production requests directed to MDC, subpoenas directed to American Airlines, rulings of the Court, etc." and remained concerned that American would receive further demands for the production of documents. On March 7, 1996, Koorenny told Long that American would not agree to his employment as ADO's rule 30(b)(6) deponent. Additional conversations between the two occurred but American's decision did not change.

Long did not feel that he needed American's permission to serve as ADO's federal rule 30(b)(6) deponent. After consulting with the ethics committee of SMRH, Long decided to accept the engagement to serve as ADO's rule 30(b)(6) deponent. Defendants concluded that the work would not be adverse to American and Long had no confidential information from American that was material to the rule 30(b)(6) deposition. Long formally

---

[5]The waiver letter, addressed to Long, stated: "This will acknowledge that you have previously represented American Airlines with respect to issues which have arisen in this litigation regarding the production by [MDC] of documents relating to American Airlines. This will further acknowledge that similar issues may arise in the future because of document production requests directed to MDC, subpoenas directed to American Airlines, rulings of the Court, etc. [¶] ADO hereby waives any conflict that exists, may exist or may arise from your serving as a Rule 30(b)(6) deponent on behalf of ADO and your past, continued and future service as an attorney on behalf of American Airlines with respect to issues which may arise in this case. ADO also specifically agrees that you may continue to serve as an attorney for American Airlines with respect to such issues and that ADO will not assert any conflict against you, your law firm or American Airlines with respect to your representation of American Airlines."

accepted the engagement on March 11, 1996, and began preparing to testify for ADO.[6]

On March 14, 1996, Long wrote a letter to Koorenny at American stating he had completed his work for American and was agreeing to be ADO's federal rule 30(b)(6) representative. The letter was received by Koorenny on March 18, 1996. In the letter, Long stated: "MDC has completed its production of American Airlines related documents. Thus, I do not anticipate that I or my firm will play any additional role in connection with that matter." In addition: "ADO has informed me that it has not served a subpoena for the production of documents on American Airlines and that it does not intend to do so. Therefore, I do not anticipate that either I or my firm will be required to represent American Airlines with respect to any document dispute between it and ADO. I am not aware of any dispute that exists between ADO on the one hand and American Airlines on the other, and should any such dispute arise in the future, ADO has waived its right to dispute the involvement of me or my firm on behalf of American Airlines." "ADO has requested that I act as a Rule 30(b)(6) witness in response to a notice served by MDC that requests information which is limited to ADO's dealings with MDC. MDC has not requested any confidential information that we learned from American Airlines. I do not believe that MDC can do so, and will not use any such information or reveal it during this engagement. . . . [W]e will refuse to reveal to any third party any privileged information which we have learned from American Airlines in the course of our representation of American Airlines. I see no conflict of interest between ADO and American which is not a party to the litigation, and I intend to accept ADO's request."

When MDC learned ADO was designating Long as a federal rule 30(b)(6) witness, MDC wrote to ADO on March 19, 1996, objecting on the basis there was a conflict of interest given Long's prior representation of American. The matter was brought to the attention of the special master, who "expressed some concern regarding the ethical problems," but ADO did not withdraw Long as its rule 30(b)(6) deponent. Around April 1, 1996, MDC served on Long and SMRH subpoenas seeking copies of all MDC documents Long reviewed on behalf of American in connection with the ADO litigation, and of all notes he made pertaining to his review of those documents. Defendants filed objections with the court and refused to turn over any documents related to American, arguing they were privileged and irrelevant to the rule 30(b)(6) deposition.

The rule 30(b)(6) deposition occurred on April 9, 1996, with Koorenny in attendance. MDC's questioning focused on information Long had previously

---

[6]In agreeing to work for ADO, Long made clear that he would not discuss any information he learned during the course of his representation of American.

obtained from American. According to defendants, it appeared to be MDC's strategy to seek the disqualification of Long as ADO's spokesperson and to induce the discovery master to issue terminating sanctions against ADO.

At the deposition, ADO's counsel objected to MDC's questions relating to American as being irrelevant, not reasonably calculated to lead to the discovery of admissible evidence, and beyond the scope of the notice. Long asserted the attorney-client privilege as to all questions related to American and did not disclose information he obtained during the course of his representation of American. Koorenny conceded no such information was disclosed by Long during the deposition. MDC apparently terminated the deposition based on Long's refusal to answer questions regarding his knowledge obtained while representing American.

ADO filed with the special master a motion for a protective order to preclude another request by MDC for a federal rule 30(b)(6) deposition, and sought sanctions against MDC for what it alleged to be misconduct in terminating the deposition after asking Long for irrelevant information regarding what he learned about the MD-11 through representing American. MDC in turn sought terminating sanctions against ADO for violating the court's order to produce a suitable rule 30(b)(6) deponent. American filed a declaration by Koorenny objecting to Long's acting as a representative for ADO, detailing American's position that Long's doing so presented a conflict of interest. In opposition, Long filed a responsive declaration explaining why his conduct did not violate any duty he owed to American, and offering to participate in an in camera hearing to discuss the relationship between American and his law firm. The special master declined to hold an in camera hearing. Koorenny filed a second declaration addressing and refuting statements made in Long's declaration, and also filed a motion on behalf of American to intervene in the matter.

After holding a hearing on the matter, on May 27, 1996, the special master issued an order denying ADO's motion for a protective order and sanctions.[7] The special master concluded: "The mere potential for ethical violations and Long's continuing duty to keep American's confidences and privileges would severely hamper Long's role as an effective 30(b)(6) witness for ADO. To test the reliability of a witness who has familiarity with the case not available to ADO, MDC would have a right to explore what information Long received prior to his education from ADO and what information he had from his prior representation. Long's duty to American does not allow him

---

[7]During the hearing, the special master clarified she was not finding Long had or had not violated a rule of professional conduct.

to testify as to any of this information. Moreover, Long refused to reaffirm the prior testimony given at the deposition for fear of violating his duty to American Airlines. Thus, Long cannot properly serve as a Rule 30(b)(6) witness. It was ADO's responsibility to explore the potential conflict when it was brought to counsel's attention by MDC and the Special Master well before ADO expended time and effort to 'educate' Mr. Long. The Motion for Protective Order is totally without merit."

On May 30, 1996, MDC produced additional documents to ADO, including some American-related documents, in response to ADO's sixth request for production of documents (served Feb. 16, 1996) by which ADO sought from MDC all American-related documents created through March 19, 1996.

On June 2, 1996, ADO dismissed its case against MDC pursuant to a confidential settlement agreement.

In October 1996, American brought the present action against Long and SMRH for breach of fiduciary duty (based on breach of the duty of loyalty, failure to preserve confidential information, and improper termination of the attorney-client relationship), professional negligence, and misappropriation of trade secrets. American twice amended the complaint, first to add a constructive trust theory to its cause of action for breach of fiduciary duty, and then to allege a breach of fiduciary duty based on defendants' failure to properly disclose the existence of their attorney-client relationship with MLB, Wawro, and Russo.

Defendants successfully moved to strike American's allegation seeking constructive trust relief and its request for private attorney general attorney fees. The trial court granted the motion to strike without leave to amend.

In addition, defendants successfully moved for summary adjudication of American's claim for punitive damages. The trial court also granted defendants' motion for summary adjudication of American's cause of action for misappropriation of trade secrets. American does not appeal from the latter ruling.

Defendants served an offer to compromise pursuant to Code of Civil Procedure section 998, offering to pay American $59,200 if American would dismiss its lawsuit with prejudice. The offer did not provide for entry of judgment in favor of American. American did not accept the offer.

Before trial, the court granted defendants' motion in limine seeking to preclude American from seeking a refund of the attorney fees paid to

defendants before the date defendants allegedly breached their fiduciary duty.

During trial, the court granted defendants' motion for directed verdict, leaving only two issues for the jury: whether American sustained any actionable injury or damages or may recover against defendants as a result of Long's serving as a federal rule 30(b)(6) witness, and whether plaintiff sustained any actionable injury or damage or may recover against defendants as the result of defendants' allegedly turning over the document indices to Wawro in the ADO litigation.

The jury was instructed not to consider whether American could recover for the costs of educating a new law firm to handle a dispute with MDC over the MD-11, or whether American could recover against defendants because they failed to tell American of defendants' representation of Wawro, Russo, or MLB.

The jury, by a nine-to-three vote, found defendants breached their fiduciary duty to American and were negligent in accepting the ADO employment. The jury awarded American damages of $8,174. The jury found that defendants did not breach a fiduciary duty or commit negligence by giving the document indices to Wawro.

The court ruled defendants' offer to settle pursuant to Code of Civil Procedure section 998 shifted costs to American, and awarded defendants $126,022.79, including $58,787.50 in expert witness fees. This amount was offset by American's monetary damages award ($8,174) and an award of the costs incurred by American prior to the Code of Civil Procedure section 998 offer ($26,815.16), which together totaled $34,989.16. The net result was an award of $91,033.63 in favor of defendants.

After American's posttrial motions for a new trial and for judgment notwithstanding the verdict were denied, the present appeal and cross-appeal followed.

## DISCUSSION

To provide the proper context for the discussion of each party's contentions, we depart from the traditional approach of first discussing the appeal. Instead, we first address the primary issue raised on defendants' cross-appeal: whether, as a matter of law, Long and SMRH breached their fiduciary duty to American. This core issue drives the analysis of the remaining assignments of error.

### I. *Issues on Cross-appeal*

#### A. *Breach of Fiduciary Duty Based on Violation of State Bar Rules of Professional Conduct*

##### 1. *Rule 3-310(C)*

■ American argued at trial that defendants violated rule 3-310(C) of the State Bar Rules of Professional Conduct (hereafter Rule 3-310(C)), and on that basis the jury could find that they had breached fiduciary duties owed to American. It is well established that an attorney's duties to his client are governed by the Rules of Professional Conduct, and that those rules, together with statutes and general principles relating to other fiduciary relationships, "help define the duty component of the fiduciary duty which an attorney owes to his client." (*Mirabito v. Liccardo* (1992) 4 Cal.App.4th 41, 45 [5 Cal.Rptr.2d 571].)

As applicable here, Rule 3-310(C) provides as follows: "A member shall not, without the informed written consent of each client: [¶] (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or [¶] (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict . . . ."

Defendants argue that application of this rule requires the offending member must have a lawyer-client relationship with both adverse parties. They cite *In re Lee G.* (1991) 1 Cal.App.4th 17, 27 [1 Cal.Rptr.2d 375] in support of the proposition that " ' "represented" ' by the attorney [in Rule 3-310 means] 'in a manner giving rise to [a lawyer-client] relationship.' " They contend that because Long merely served ADO as a federal rule 30(b)(6) witness, there was no attorney-client relationship and thus there could be no violation of Rule 3-310(C).[8]

■ We disagree. Application of Rule 3-310(C) does not require representation of both clients *as an attorney*. The discussion section which

---

[8]Defendants' citation of *In re Lee G., supra,* 1 Cal.App.4th 17, 27, is misplaced. The *Lee G.* court merely stated that Rule 3-310 "never becomes applicable where *the party seeking the attorney's disqualification* fails to establish that *such party* was or is ' "represented" ' by the attorney 'in a manner giving rise to an attorney-client relationship.' (*Civil Service Com.* v. *Superior Court* (1984) 163 Cal.App.3d 70, 77 [209 Cal.Rptr. 159].)" (*In re Lee G., supra,* at p. 27, italics added [party, subject to conservatorship, seeking disqualification of county counsel, did not have constructive attorney-client relationship with her conservator's designated attorney, county counsel].) There is no dispute that American and Long had an attorney-client relationship.

follows Rule 3-310 states: "Subparagraphs (C)(1) and (C)(2) are intended to apply to all types of legal employment, including the concurrent representation of multiple parties in litigation or in a single transaction or in some other common enterprise or legal relationship."

*William H. Raley Co. v. Superior Court* (1983) 149 Cal.App.3d 1042 [197 Cal.Rptr. 232] is illustrative. There, the Court of Appeal issued a peremptory writ of mandate directing the trial court to grant a defendant's motion to disqualify a law firm in the following situation. Rupert Gilbert Carroll had sued William H. Raley Co., Inc. The law firm of Gray, Cary, Ames & Frye represented the plaintiff Carroll. The defendant moved to disqualify the plaintiff's counsel. Its motion was based on the fact that a partner of the Gray, Cary firm, Karl ZoBell, was also a director of the La Jolla Bank & Trust Company. The bank, in turn, was trustee of the William H. Raley Testamentary Trust, which held 100 percent of the Raley corporation common stock. ZoBell was also a member of the bank's trust investment committee.[9] The bank's trust investment committee and its board of directors had authority to settle lawsuits involving wholly owned companies such as the Raley corporation. The Gray, Cary firm also represented the bank in various corporate matters, though it did not represent the bank as trustee. Thus, the Gray, Cary firm represented Carroll, and simultaneously included among its partners a member of the governing entity responsible for settling lawsuits on behalf of the Raley corporation. Based upon these facts, the Raley corporation moved to disqualify the Gray, Cary firm from representing Carroll.

In first determining whether a conflict of interest existed, the Court of Appeal looked to State Bar Rules of Professional Conduct former rule 5-102(B), the predecessor of Rule 3-310. Former rule 5-102(B) provided: " 'A member of the State Bar shall not represent conflicting interests, except with the written consent of all parties concerned.' " (*William H. Raley Co. v. Superior Court, supra,* 149 Cal.App.3d at p. 1046.) The court concluded the situation before it presented a conflict of interest, stating as follows: "*Professional responsibilities do not turn on whether a member of the State Bar acts as a lawyer. 'One who is licensed to practice as an attorney in this state must conform to the professional standards in whatever capacity he may be acting in a particular matter.* [Citation.]' (*Libarian v. State Bar* (1943) 21 Cal.2d 862, 865 [136 P.2d 321]; accord, *Baron v. City of Los Angeles* (1970) 2 Cal.3d 535, 542 [86 Cal.Rptr. 673, 469 P.2d 353, 42 A.L.R.3d 1036].) Thus the scope of former rule 5-102(B) includes conflicts of interest arising

---

[9]The court specifically noted that ZoBell did not hold either of these positions as an attorney. (*William H. Raley Co. v. Superior Court, supra,* 149 Cal.App.3d at p. 1045.)

other than in the course of legal representation. '[A] conflict of interest [under former rule 5-102(B)] may arise from an attorney's relationship with a nonclient. Such a conflict of interest may arise [1] where an attorney's relationship with a person or entity creates an expectation that the attorney owes a duty of fidelity. It may also arise [2] where the attorney has acquired confidential information in the course of such a relationship which will be, or may appear to the person or entity to be, useful in the attorney's representation in an action on behalf of a client.' (Cal. Compendium on Professional Responsibility . . . , State Bar Formal Opinion No. 1981-63, p. 3.)" (*William H. Raley Co. v. Superior Court, supra,* 149 Cal.App.3d at pp. 1046-1047, italics added, fn. omitted.)

■ Long's role as a federal rule 30(b)(6) deponent on behalf of ADO involved his being privy to and therefore able to testify about a vast amount of information "known or reasonably available to the organization," regarding everything from the corporate structure of ADO to the nature of its contentions against MDC and the source of its knowledge giving rise to such contentions.[10] There is no doubt that as ADO's rule 30(b)(6) representative, Long, acted as ADO's agent, and in that capacity owed fiduciary duties to ADO. An agent *is* a fiduciary. (*Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1579 [36 Cal.Rptr.2d 343].) " 'Confidential and fiduciary relations are, in law, synonymous, and may be said to exist whenever trust and confidence is reposed by one person in the integrity and fidelity of another. . . .' " (*Id.* at p. 1581, citations omitted.) As ADO's fiduciary, Long was required to act in ADO's best interests. The situation clearly presented a potential for a conflict of interest to arise. Long was obligated to act as ADO's witness and to answer the questions put to him at the deposition to the best of his ability, and to avoid being found an inadequate rule 30(b)(6) deponent. As American's attorney, he also was obligated to preserve American's confidences. Thus, regardless of whether or not he was giving legal advice to ADO, the situation presented a conflict between the fiduciary duties owed to ADO and those owed to American. (See *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft* (1999) 69 Cal.App.4th 223, 230 [81 Cal.Rptr.2d 425].)

We hold that the circumstances presented here fall within the purview of the prohibition of Rule 3-310(C), even though the attorney (Long) was not

---

[10] Federal rule 30(b)(6) provides in relevant part: "A party may in the party's notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. A subpoena shall advise a non-party organization of its duty to make such a designation. The persons so designated shall testify as to matters known or reasonably available to the organization. This subdivision (b)(6) does not preclude taking a deposition by any other procedure authorized."

engaged to render legal advice to ADO. For purposes of the rule and the perils it seeks to avoid, Long's acting as a federal rule 30(b)(6) representative for ADO placed him in a position of trust where he could be compelled to choose which of two conflicting loyalties he would honor. Defendants' challenge, as a matter of law, to the jury's finding that defendants breached their fiduciary duty by violating Rule 3-310(C) must fail.

After the completion of briefing, defendants brought to our attention a recent case decided by a federal district court, *Commonwealth Ins. Co. v. Stone Container Corp.* (N.D.Ill. 2001) 178 F.Supp.2d 938. In that case, Stromberg, a lawyer in a firm's Los Angeles office represented the Stone corporation in a transactional matter involving a joint venture in China. Sugarman, a lawyer in the firm's San Francisco office, was then engaged by Aon Risk Services, Inc., to serve as an expert witness in litigation between Aon and Stone. Sugarman was to provide expert testimony on the previous insurance litigation strategy and positions taken by Stone in pursuit of insurance coverage. Stone filed a motion seeking to disqualify Sugarman pursuant to American Bar Association Model Rules of Professional Conduct, rules 1.7 and 1.10.[11]

In denying the motion to disqualify Sugarman, the district court noted that the rules speak only to situations involving the "representation" of clients in an attorney-client relationship. The court concluded that a law firm undertaking the role of testifying expert does not form an attorney-client relationship and thus the rules do not apply. "Without a request for legal advice or any expectation of confidentiality, we find that the engagement between testifying expert and the retaining party does not form an attorney-client relationship within the meaning of the ethical rules." (*Commonwealth Ins. Co. v. Stone Container Corp., supra,* 178 F.Supp.2d at p. 945.)

The court based its denial of the motion to disqualify on its conclusion that rule 1.7 of the American Bar Association Model Rules of Professional Conduct by its express terms did not apply because: (1) although Aon and Stone were directly adverse in the litigation at issue, they were not directly

---

[11]Rule 1.7(a) provides that a lawyer shall not represent a client if such representation will be directly adverse to another client, unless the lawyer reasonably believes the representation will not adversely affect the relationship with the other client, and each client consents after disclosure. Rule 1.7(b) provides that a lawyer shall not represent a client if such representation may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless the lawyer reasonably believes the representation will not be adversely affected and the client consents after disclosure. Rule 1.10 provides that no lawyer associated with a firm shall represent a client when the lawyer knows or reasonably should know that another lawyer associated with that firm would be prohibited from doing so.

adverse with respect to the law firm's representation of Stone in the China deal and its engagement with Aon as an expert witness; and (2) by its terms, rule 1.7(b) applies only to a situation in which a lawyer *first* is engaged as a testifying expert, and then later seeks to represent a client in a matter in which the lawyer's responsibilities to the former might materially limit his or her representation of the latter. (*Commonwealth Ins. Co. v. Stone Container Corp., supra,* 178 F.Supp.2d at pp. 945-946.)

Finally, despite concluding that rule 1.7 of the American Bar Association Model Rules of Professional Conduct by its express terms did not apply, the court found it necessary to look at the substance or "spirit," rather than the form, of the ethical rules to determine whether the law firm's engagement as a testifying expert for Aon breached its duty of loyalty to Stone as a concurrently represented client, or created an appearance of impropriety. (*Commonwealth Ins. Co. v. Stone Container Corp., supra,* 178 F.Supp.2d at p. 946.) The court stated, "As we read the Comment to Rule 1.7, the duty of loyalty to a represented client should always raise a question in the mind of an attorney who subsequently seeks to concurrently serve as a testifying expert for a third-party who is adverse to the client. A testifying expert is (at least theoretically) objective—hired only to evaluate evidence and/or information, rather than to strategize and/or utilize this information to advocate in favor of the third-party and against the client. [Citation.] Nonetheless, we can envision situations in which the testifying expert's firm, by virtue of its representation of the client, may possess client confidences that could be used to the client's detriment. . . . [¶] [T]here is some force to the theory . . . that '[i]t is no comfort to a client to learn that his attorney appears against him—not as an attorney advocate, but as an attorney expert consultant and witness.' " (*Id.* at pp. 947-948.) The court concluded, however, that the undisputed facts in the case before it did not support a finding of conflict, where the lawyers involved, Stromberg and Sugarman, were in two different offices of the law firm, and the matters involved, the China deal and serving as a testifying expert with regard to insurance coverage issues, were wholly unrelated.

To the extent that the court in the foregoing case concluded that use of the word "representation" in the American Bar Association Model Rules of Professional Conduct denotes that there must be an attorney-client relationship with both clients involved in a potential conflict of interest, we decline to reach the same conclusion with regard to Rule 3-310(C) of the State Bar Rules of Professional Conduct, for the reasons discussed previously. Furthermore, the factual situation involved in the *Commonwealth* case is entirely distinguishable from the one at issue here, in which a conflict of interest

clearly arose, and the lawyer's duty of loyalty to the complaining client was indeed called into question. In fact, the situation in the case before us is the one hypothetically described by the court in *Commonwealth*, in which "the testifying expert's firm, by virtue of its representation of the client, may possess client confidences that could be used to the client's detriment." (*Commonwealth Ins. Co. v. Stone Container Corp., supra*, 178 F.Supp2d at p. 947.)

Given our conclusion that violation of Rule 3-310(C) does not require there to be an attorney-client relationship with both clients, we obviously also reject defendants' contention that the trial court erroneously refused defendants' special instruction No. 2, which stated that the rule "does not apply unless the defendant acts as a lawyer for both clients. If he acts as a lawyer for one client and as a witness for another client, he does not violate the rule."

Defendants further argue that their special instruction No. 3 should have been given. It would have instructed the jury that Rule 3-310(C) "also does not apply unless the lawyer represents two clients at the same time. If he stops representing one before beginning to represent the other, he does not violate the rule . . . ." Defendants assert the trial court refused explanatory instructions and instead "read the Rules to the jury without meaningful explanation."

The court was correct in refusing special instruction No. 3, which would have unduly emphasized defendants' theory of the case, i.e., that their representation of American had concluded prior to Long's undertaking representation of ADO. There was factual support from which the jury could conclude that Long's representation had not ended until he informed American, by letter dated March 14, 1996, that he considered the representation to be at an end. ■ A lawyer may not avoid the automatic disqualification rule applicable to concurrent representation of conflicting interests by unilaterally converting a present client into a former client. (*Truck Ins. Exchange v. Fireman's Fund Ins. Co.* (1992) 6 Cal.App.4th 1050, 1057 [8 Cal.Rptr.2d 228]; see also *Flatt v. Superior Court* (1994) 9 Cal.4th 275, 288 [36 Cal.Rptr.2d 537, 885 P.2d 950].) ■ It therefore follows, a lawyer may not avoid breaching the duty of loyalty which the concurrent representation rule is designed to avoid by unilaterally converting a present client into a former client. In fact, such conversion may itself be a breach of loyalty.

In sum, the court's instructions regarding the applicable State Bar Rules of Professional Conduct, containing the text of the rules themselves, explaining how the rules help to define the duty owed by lawyers to clients, and

defining the concepts of a client "secret," "adverse," "adverse employment," and "informed written consent," were adequate.

### 2. *Rule 3-310(E)*

Defendants also contend that, as a matter of law, they could not properly be found to have breached a duty delineated in rule 3-310(E) of the State Bar Rules of Professional Conduct (hereafter Rule 3-310(E)). It provides: "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."

In *City National Bank v. Adams* (2002) 96 Cal.App.4th 315 [117 Cal.Rptr.2d 125], Division Seven of this court discussed application of Rule 3-310(E) in the context of a motion to disqualify an attorney for undertaking successive representation of adverse interests. The court stated: "Our analysis of the case law involving successive representation of clients leads us to three conclusions that guide resolution of this case. First, if the nature of the representation is such that confidences *could have* been exchanged between the lawyer and the client, courts will conclusively presume they *were* exchanged, and disqualification will be required. [Citations.] [¶] Second, there is a limited exception to this conclusive presumption in the rare instance where the lawyer can show that there was no *opportunity* for confidential information to be divulged. [Citations.] [¶] Third, the limited exception is *not* available when the lawyer's former and current employment are on opposite sides of the very same matter or the current matter involves the work the lawyer performed for the former client. When the lawyer switches sides in an ongoing dispute such as the one between the parties in this case, the nature of the former representation will *always* be such that the exchange of relevant confidences must be presumed. [Citations.]" (*City National Bank v. Adams, supra,* at pp. 327-328.)

Defendants argue their employment with ADO was not *adverse* to American, and that Long possessed no confidential information of American's that was *material* to the employment with ADO. To support this contention, defendants argue that American was not a party to the lawsuit, that ADO sought only monetary relief against MDC, and American itself had previously been adverse to MDC with respect to the MD-11. Defendants contend that because under the Federal Rules of Civil Procedure all discovery is limited to nonprivileged information (Fed. Rules Civ.Proc., rule 26(b)(1), 28 U.S.C.), American's privileged information was beyond the

scope of Long's engagement by ADO and beyond the scope of permissible questioning by MDC at the rule 30(b)(6) deposition. According to defendants, Long was only required to testify as to matters known or reasonably available to ADO that were specified in the deposition notice. Long made it a condition of his employment with ADO that he not be required to reveal confidential information obtained from American, and ADO accepted this condition. "If, as the discovery master later ruled, this made Long an inadequate spokesperson, the consequences were borne by ADO, not [American]. Long had created terms of employment that insured he would not be required to reveal confidential information obtained from [American]." Defendants argue that "There was never any danger that Long would disclose any such information because he was in sole control of any disclosure and had agreed he would not make any disclosure."

We categorically reject defendants' analysis. It is anathema to the State Bar Rules of Professional Conduct to suggest that an attorney can place himself in a situation in which he undertakes adverse representation of a third party, and the client cannot object because the attorney has promised not to disclose the client's confidential information even though the information may be decidedly helpful to the new client. It is precisely this compromised situation, when the burden of deciding which client to favor is placed solely on the attorney's shoulders and within the attorney's sole power to decide, that Rule 3-310 is designed to avoid. In other words, Long's promise to maintain the confidences of American is entirely dependent on his self-assumed position as arbiter of his own fidelity and what is and is not a privileged communication. That is not a permissible avoidance of his fiduciary duty.

It is inconsequential that American was not a party to the ADO lawsuit. The proscription against adverse representation exists whenever counsel's employment is adverse to the client or former client, and can exist even though a prior client is not a party to the litigation. (*Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.* (1995) 36 Cal.App.4th 1832, 1843 [43 Cal.Rptr.2d 327].) Conflicts of interest may arise in a variety of circumstances where an attorney assumes a role other than as an attorney at law adverse to an existing client. (Cf. *Manfredi & Levine v. Superior Court* (1998) 66 Cal.App.4th 1128, 1132-1133 [78 Cal.Rptr.2d 494].)

Although ADO's primary objective was to obtain monetary relief from MDC through litigation, ADO's pursuit of that goal included American in its discovery proceedings. It was Long's function as attorney for American to resist ADO's discovery efforts. While previously American had been adverse to MDC with regard to a contract to purchase MD-11 aircraft, it was in

American's interests to maintain a cooperative relationship with MDC, whose aircraft it continued to use. Clearly it is in American's interests to not contribute to public disparagement of MDC's aircraft whenever possible.

Everything Long learned about the MD-11 while representing American was placed beyond American's control and its confidential status depended on Long's promise to safeguard that information. Clients always have to trust attorneys to maintain confidences imparted during the course of the attorney-client relationship, but they are not compelled to accept the attorney's invitation to "trust me" when he undertakes to align himself with a new client whose interests pose a conflict of interest. A client is simply not required to forfeit the right to control the disclosure of its confidential information to the unfettered determination of its attorney regardless of his vow to protect the client's confidences.

The rules seek to avoid allowing an attorney to take a role that places him in actual or potential conflict with a client. As eloquently stated by the court in *Goldstein v. Lees* (1975) 46 Cal.App.3d 614 [120 Cal.Rptr. 253] regarding former rule 5 of the State Bar Rules of Professional Conduct, the predecessor to Rule 3-310: "The question is whether or not the *employment* of Kirshman was adverse to the interests of the former client. Clearly, it was. [¶] Business and Professions Code section 6068, subdivision (e), states: 'It is the duty of an attorney: . . . [t]o maintain inviolate the confidence, and at every peril to himself to preserve the secrets, of his client.' In this instance, Kirshman accepted employment which surely at best must have tempted him to reveal or to improperly monopolize the confidences and secrets of his former client. As the Supreme Court recognized in *Anderson* v. *Eaton* [(1930) 211 Cal. 113 [293 P. 788]] (at p. 117), 'Conscience and good morals dictate that an attorney should not so conduct himself as to be open to the temptation of violating his obligation of fidelity and confidence.' Clearly, the acceptance of employment which threatens the revelation or improper monopolization of a former client's confidences is adverse to the interests of the former client. To be sure, rule 5 implies that an attorney may accept employment on a matter in reference to which he has before obtained confidential information, but nothing in rule 5 sanctions the acceptance of such employment when the representation of the interests of the new client inherently tempts the attorney to reveal or improperly monopolize the confidences of the old. Such a reading of rule 5 would conflict with the policies underlying section 6068, subdivision (e), of the Business and Professions Code; it would needlessly permit attorneys to create the appearance of impropriety. Nor would such an interpretation offer assistance to the new client. Clients are entitled to vigorous and determined representation by

counsel. It is difficult to believe that a counsel who scrupulously attempts to avoid the revelation of former client confidences—i.e., who makes every effort to steer clear of the danger zone—can offer the kind of undivided loyalty that a client has every right to expect and that our legal system demands. Rule 5 operates to preclude any impediment to the fulfillment of an attorney's professional obligation to his client by proscribing any conflict of interest in his representation of past and present clients. ' "It is better to remain on safe and secure professional ground, to the end that the ancient and honored profession of the law and its representatives may not be brought into disrepute. Courts have consistently held the members of the profession to the strictest account in matters affecting the relation of attorney and client." ' (*Tomblin* v. *Hill* [(1929)] 206 Cal. 689, 694 [275 P. 941], quoting *Addison* v. *Cope* [(1922)] 210 Mo.App. 569 [243 S.W. 212, 215].)" (*Goldstein v. Lees, supra,* 46 Cal.App.3d at pp. 619-620, italics in original, fn. omitted.)

Defendants' argument that MDC could not discover what information Long obtained from American because that information was privileged is unavailing. MDC was entitled to know what ADO knew. MDC was entitled to fully explore the source and extent of ADO's knowledge about problems with the MD-11,[12] and indeed to find out whether American had breached the terms of its confidential settlement agreement with MDC by way of Long's disclosing to ADO information obtained from American. At the very least, if Long had shared with ADO information he obtained from American, American would have been placed in the position of having to invoke and defend the privileged status of its information. If it failed to do so, the information would have lost its privileged status and would have been discoverable.

Defendants misleadingly quote from the case of *King v. Pratt & Whitney* (S.D.Fla. 1995) 161 F.R.D. 475, 476, to argue that as a federal rule 30(b)(6) spokesperson, Long was "only required to 'answer questions that are *both*

---

[12]Defendants argue that Long's representation of American involved MD-11's with General Electric (GE) engines while ADO's MD-11's had Pratt & Whitney engines, and therefore the subject matter of the representations was not substantially related. That is hardly a distinction of consequence in the context of ADO's discovery proceedings. ADO was interested in obtaining all the information from American that it could regarding American's knowledge of problems with its MD-11. Long represented American in curtailing that very discovery. Meanwhile, MDC had full knowledge that ADO was seeking to discover American's documents; it was MDC, after all, that originally informed American of that fact. Where the prior representation is in the same matter as the current representation, and the matters are factually and legally intertwined, there exists a substantial relationship between the former and current representation. "Absent the former client's informed written consent, an attorney may never switch sides in an ongoing legal matter." (*City National Bank v. Adams, supra,* 96 Cal.App.4th at p. 330.)

within the scope of the matters described in the notice *and* are "known or reasonably available" to the corporation.' " When the quotation is placed in its full context, we find the *King* case actually held to the contrary:

"[T]he Rule is best read as follows:

"1) Rule 30(b)(6) obligates the responding corporation to provide a witness who can answer questions regarding the subject matter listed in the notice.

"2) If the designated deponent cannot answer those questions, then the corporation has failed to comply with its Rule 30(b)(6) obligations and may be subject to sanctions, etc. The corporation has an affirmative duty to produce a representative who can answer questions that are both within the scope of the matters described in the notice and are 'known or reasonably available' to the corporation. Rule 30(b)(6) delineates this affirmative duty.

"3) *If the examining party asks questions outside the scope of the matters described in the notice, the general deposition rules govern* (i.e. Fed.R.Civ.P. 26(b)(1)), *so that relevant questions may be asked and no special protection is conferred on a deponent by virtue of the fact that the deposition was noticed under 30(b)(6).*

"4) However, if the deponent does not know the answer to questions outside the scope of the matters described in the notice, then that is the examining party's problem.

"This interpretation does not render the 'describe with reasonable particularity' language 'superfluous'; rather, it imposes an obligation on a corporation to provide someone who can indeed answer the particular questions presaged by the notice. Rule 30(b)(6) does not limit what can be asked at deposition.

"Since *there is no specific limitation of what can be asked at deposition,* the general deposition standards govern. The reason for adopting Rule 30(b)(6) was not to provide greater notice or protections to corporate deponents, but rather to have the right person present at deposition. The Rule is not one of limitation but rather of specification within the broad parameters of the discovery rules. This is made clear by both the Advisory Committee's statement that 30(b)(6) 'should be viewed as an added facility for discovery . . .' and the Rule's final sentence: 'This subdivision (b)(6) does not preclude taking a deposition by any other procedure authorized in these rules.' Fed.R.Civ.P. 30(b)(6) advisory committee's note. This Court sees no

harm in allowing all relevant questions to be asked at a Rule 30(b)(6) deposition or any incentive for an examining party to somehow abuse this process.

"In sum, this Court concludes that *Rule 30(b)(6) cannot be used to limit what is asked of a designated witness at a deposition.* Rather, the Rule simply defines a corporation's obligations regarding whom they are obligated to produce for such a deposition and what that witness is obligated to be able to answer." (*King v. Pratt & Whitney, supra,* 161 F.R.D. 475, 476, italics added; but see *Paparelli v. Prudential Ins. Co. of America* (D.Mass. 1985) 108 F.R.D. 727 [party must confine deposition to matters stated "with reasonable particularity" in notice of deposition, but counsel for other party could not properly instruct witness not to answer questions on ground they went beyond subject matter listed in notice of deposition].)

Also contrary to defendants' suggestion, it is indeed the fact that Long put himself in the position to be asked general questions by MDC, thus creating an ethical dilemma. "The actual use or misuse of confidential information is not determinative; it is the possibility of the breach of confidence which controls. [Citation.]" (*David Welch Co. v. Erskine & Tulley* (1988) 203 Cal.App.3d 884, 891 [250 Cal.Rptr. 339].) It was not necessary for American to establish that Long answered the questions, thus revealing confidential information, in order to prove that Long breached his fiduciary duty to American. He placed the noose around American's neck, without its consent, promising all the while not to kick over the chair on which it stood, blithely ignoring the sweat forming on the corporate brow. He may have been confident in his ability to resist the temptation to favor ADO's interests, but the State Bar Rules of Professional Conduct exist to prevent clients like American from being placed in such a precarious position. "Nor does it matter that the intention and motives of the attorney are honest. The rule is designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent." (*Anderson v. Eaton, supra,* 211 Cal. 113, 116.) We do not doubt that Long believed he could maintain his client's confidence, but American simply does not have to take his word for it.

### 3. *Actual Impairment of Long's Fulfillment of His Duties*

In arguing there was no legal basis for imposing liability, defendants argue that "[c]ourts have only found breach of fiduciary duty or negligence

based on a conflict of interest when there was an actual, rather than a merely potential, conflict of interest that actually impaired the attorney's fulfillment of his duties to the client."[13] "Actual injury has always been required as a prerequisite to civil liability." American did prove just that with evidence that despite its legitimate protests, Long persisted in representing ADO. American was compelled to appear at the federal rule 30(b)(6) deposition to ensure Long was disqualified from representing a conflicting interest that imperiled American's confidences. Long actively opposed those efforts. Clearly he owed a duty of loyalty to American that he did not fulfill, causing damage to American.

In nearly every instance the " ' "relation between attorney and client is a fiduciary relation of the very highest character, and binds the attorney to most conscientious fidelity—*uberrima fides*." [Citations.] Among other things, the fiduciary relationship requires that the attorney respect his or her client's confidences. [Citations.] It also means that the attorney has a duty of loyalty to his or her clients. [Citations.]' " (*Cal Pak Delivery, Inc. v. United Parcel Service, Inc.* (1997) 52 Cal.App.4th 1, 11 [60 Cal.Rptr.2d 207].) Here, when American would not consent to Long's engagement by ADO, he ceremoniously declared that he and SMRH terminated the relationship with American to undertake a responsibility with an entity that was pursuing his client's confidences; confidences he and his law firm had been engaged to protect. It matters not that in the final analysis American's confidences were not disclosed. What matters more is that Long and SMRH exhibited an absence of loyalty when they jettisoned American in order to assume a preferred position with ADO.

The trial court did not err by refusing defendants' proposed instructions that (1) an element of a claim for breach of fiduciary duty is "[t]hat defendants' representation of plaintiff was rendered less effective because of defendants' breach of fiduciary duty"; and (2) "Even if you find that defendants violated any of their duties to plaintiff, you may not find that they are required to pay damages for breach of fiduciary duty or professional negligence unless you find that the quality of the work defendants performed for plaintiff actually was lowered as a result of any conflict of interest." Those instructions are misleading, incorrect statements of the law applicable in this case. American was required to establish as an element of its case that it suffered damages as a result of defendants' breach of fiduciary duty. It did

[13]Having concluded there was as a matter of law a sufficient basis for the jury to decide that defendants breached the State Bar Rules of Professional Conduct, we need not address defendants' contention that there was no legal basis for liability because there was no violation of any common law duty owed to American, in the absence of a violation of the rules.

so when it established it spent $8,174 in attorney fees to prevent Long from serving as ADO's federal rule 30(b)(6) spokesperson.

**B., C.***

. . . . . . . . . . . . . . . . . . . . . . . . . .

## II. *Issues on Appeal*

### A. *Motion for Summary Adjudication on Claim for Punitive Damages*

 Defendants filed a motion for summary adjudication of American's claim for punitive damages, contending there was no evidence of malice, fraud or oppression on the part of Long or SMRH. Defendants contended that American could not prove that Long or SMRH intended to injure American or that their conduct demonstrated despicable conduct in conscious disregard of American's rights. Long declared that he reasonably believed that his service as a federal rule 30(b)(6) deponent would not involve a conflict of interest with American. Moreover, defendants contend that Long divulged none of American's confidential or privileged information during the course of his engagement by ADO or otherwise.

Specifically, in their separate statement of undisputed facts, defendants established by competent evidence that beginning in 1990 Long was engaged by American to advise it regarding potential causes of action it might have against MDC regarding "one version" of the MD-11, based upon performance of the MD-11 concerning the distances the aircraft could fly without refueling. American did not dispute those facts. In connection with that assignment, Long and other SMRH lawyers reviewed relevant American MD-11 documentation and drafted a complaint alleging claims against MDC. The complaint was never filed.

Although Long declared that American "stopped consulting SMRH about whether to sue MDC based on the MD-11" in 1992, it is undisputed that American retained Long in early 1994 to review American MD-11-related documents to be produced by MDC in the ADO litigation. Defendants contend American told Long that Wawro was the MLB attorney in charge of representing ADO, but American disputes this fact. Long reviewed documents and prepared indices of documents for American between February 1994 and July 1995. It is undisputed that from 1993 through 1995, defendants spent 53 hours on work for American.

*See footnote, *ante*, page 1017.

It is undisputed that on February 15, 1996, American again engaged Long and SMRH to review and resist the production of American's MD-11 documents. Defendants assert that between February 15 and February 21, 1996, Long acted as "intermediary" between American and ADO regarding a document subpoena ADO proposed to serve on American.

In opposition, American responded that Long had been retained in July 1990, and his work on behalf of American in the ADO litigation continued through March 18, 1996, when Long terminated the relationship. American expected Long to protect American's interests with regard to discovery in the ADO lawsuit. It disputed defendants' characterization of Long's function in February 1996 as merely being an "intermediary" rather than as American's counsel engaged to advise it how to respond to MLB's request to accept service of a subpoena for the production of its privileged and confidential documents.

Before accepting the engagement as ADO's federal rule 30(b)(6) deponent, Long telephoned Koorenny to "inform her" of ADO's request that he serve in that capacity. American asserted that he did not tell her until late February or early March 1996 that he had previously received ADO's documents on February 20, 1996. Defendants responded that ADO provided a waiver to ensure Long would not be disqualified from representing American in the future, and that ADO agreed not to subpoena American in the ADO lawsuit. American argued that the waiver letter did not state that ADO waived its right to seek documents from American, and Long told Koorenny that ADO had only agreed not to serve the subpoena "for now."

Defendants asserted that Long was never employed by ADO as an attorney, expert witness, or in any capacity other than a federal rule 30(b)(6) deposition spokesperson. American disputed that characterization. Defendants further contended that Long told ADO and its counsel that he could not reveal any of American's information; Long reviewed no documents obtained from American in preparation for his rule 30(b)(6) testimony; at the deposition, Long expressly refused to answer any questions relating to his representation of American; and Long did not disclose any of American's confidential information at any time during his period of service as ADO's rule 30(b)(6) witness.

In response, American asserted that Long revealed confidential information regarding his representation of American to Wawro. American contended that when Long became ADO's representative, all of his knowledge of American's experiences with the MD-11 became available to ADO,

including a large number of American documents he retained through the time of his deposition. At the deposition, MDC "attempted to determine the extent of Long's knowledge about the MD-11 whether it was derived from his representation of American or from ADO." American also argued that a declaration filed by Wawro in the ADO action—in which he expressed with assurance that "American had a different case than ADO[; w]e concluded that there could be no conflict between ADO and [American] in that [American's] MD-11s carried GE engines"—shows that MLB knew what American's MD-11 case was all about.

In opposition to the motion for summary adjudication, American raised as disputed issues: (1) whether Long concealed his representation of ADO's lawyers from American when he agreed to protect American's interests in the ADO litigation; (2) whether Long acted as a secret adviser to ADO's lawyers as early as 1993 in the ADO litigation; (3) whether Long misled American to believe he had negotiated a limited production of American documents when he had actually allowed ADO's lawyers to pick from their "wish list" of American's highly confidential documents (referring to the document indices given by Long to Wawro); (4) whether Long intentionally breached his duties of loyalty and confidentiality by accepting, without American's consent, employment with ADO; (5) whether Long concealed from American that he had given confidential and privileged documents to ADO; (6) whether Long concealed his work as ADO's federal rule 30(b)(6) witness from American while still representing American in the ADO litigation; and (7) whether defendants intentionally violated their duty of loyalty to American by terminating American as a client so they could accept more lucrative employment with ADO and by refusing to return American's documents until Long had been disqualified as ADO's representative.

In reply, defendants argued that their alleged (1) concealment of assisting MLB with old, unrelated pleadings and advice on expert witnesses, and representing them in other litigation; (2) secret sharing with MLB of confidential, detailed indices of American's documents; (3) accepting employment as ADO's federal rule 30(b)(6) spokesperson; (4) and terminating American as a client in favor of more lucrative representation, did not constitute malice, oppression, or fraud, and would not justify an award of punitive damages.

After hearing argument, the court granted the motion for summary adjudication. It ruled that there was no evidence showing that defendants acted with malice, oppression, or fraud. "There is no evidence in this record—and nothing which would come close to satisfying the standard or [sic] clear and

convincing evidence—of the kind of misbehavior which would furnish a basis for an award of punitive damages against movants: conscious disregard of the rights of another; an evil motive; ill will; a desire to do harm; a mischievous spirit; indifference toward obligations owed others; conduct which is vile, base, contemptible, miserable, wretched, or loathsome; reprehensible conduct; fraudulent conduct; or conduct in violation of public policy." The court continued: "The various wrongs which plaintiff claims movants committed do not show—or support inferences—of the level of blameworthiness or the mental state necessary to support an award of punitive damages. The reality is, moreover, that the record indicates that defendant Long did not disclose [American]'s secret or confidential information during his deposition, or allow anybody to get him into a conversation about affairs concerning [American]. If there was a violation of the duty of loyalty and the duty of candor, the record shows that there is no triable issue of material fact concerning the extent of violation—it was relatively minor, not tainted with the opprobrious qualities necessary to serve as a foundation for punitive damages, and not intended by any defendant to be harmful to plaintiff [American]. [Fn. omitted.]"

On appeal, American contends that the trial court erred in granting the motion for summary adjudication, thus precluding it from presenting its claim for punitive damages to a jury. ■ Since summary judgment involves pure matters of law, we review a summary judgment or summary adjudication ruling de novo to determine whether the moving and opposing papers show a triable issue of material fact. (*Edward Fineman Co. v. Superior Court* (1998) 66 Cal.App.4th 1110, 1116 [78 Cal.Rptr.2d 478].) But that is our sole function; we do not decide the merits of the issues themselves. (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) The affidavits of the moving party are strictly construed, and those of the opponent liberally construed. Any doubts as to the propriety of granting the motion are resolved in favor of the party opposing the motion. (*Ibid.*)

■ Under Civil Code section 3294, punitive damages may be recovered "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice . . . ." (§ 3294, subd. (a).) Malice is defined as either "conduct which is intended by the defendant to cause injury to the plaintiff," or "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (§ 3294, subd. (c)(1).) Oppression is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (§ 3294, subd. (c)(2).) Fraud is "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with

the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (§ 3294, subd. (c)(3).)

Since the 1987 amendments to Civil Code section 3294, oppression, fraud, or malice must be proven by "clear and convincing" evidence. These amendments indicate that the Legislature intended the evidentiary standard to provide a statutory limitation on the award of punitive damages. (*Mock v. Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 331 [5 Cal.Rptr.2d 594].) ■ In ruling on a summary judgment or summary adjudication motion, "the judge must view the evidence presented through the prism of the substantive [clear and convincing] evidentiary burden. . . . [¶] [This] holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." (*Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 254-255 [106 S.Ct. 2505, 2513, 91 L.Ed.2d 202]; see also *Stewart v. Truck Ins. Exchange* (1993) 17 Cal.App.4th 468, 482 [21 Cal.Rptr.2d 338] [citing *Anderson* with approval].)

Accordingly, although the "clear and convincing" evidentiary standard is a stringent one, it does not impose on a plaintiff the obligation to "prove" a case for punitive damages at summary judgment.[14] (Cf. *Rowe v. Superior Court* (1993) 15 Cal.App.4th 1711, 1734-1735 [19 Cal.Rptr.2d 625].) However, where the plaintiff's ultimate burden of proof will be by clear and convincing evidence, the higher standard of proof must be taken into account in ruling on a motion for summary judgment or summary adjudication, since if a plaintiff is to prevail on a claim for punitive damages, it will be necessary that the evidence presented meet the higher evidentiary standard. (*Basich v. Allstate Ins. Co.* (2001) 87 Cal.App.4th 1112, 1118-1120 [105 Cal.Rptr.2d 153].) The trial court here properly viewed the evidence presented by American with the higher burden in mind, as do we.

■ Cutting through the quibbling of the separate statements of undisputed facts filed by the parties, the following relevant and undisputed facts are unequivocally established: from 1990 through February 1996, Long and

---

[14]American's reliance on *Certain Underwriters at Lloyd's of London v. Superior Court* (1997) 56 Cal.App.4th 952 [65 Cal.Rptr.2d 821], for the proposition that the burden of proof on summary adjudication motions is not the same as it is at trial, is misplaced. That case discussed the party on whom the burden of proof is placed at summary judgment as opposed to at trial, *not* the quantum of proof involved in various types of claims.

SMRH were engaged as attorneys to represent American with respect to its potential claims against MDC with respect to the MD-11 aircraft and to advise and assist American in protecting its related confidential documents against the discovery proceeding in the ADO/MDC lawsuit. Over American's specific objection, the defendants accepted an assignment from ADO to serve as its Rule 30(b)(6) witness, submitting himself to a deposition that implicitly involved the MD-11 aircraft. It is undisputed that Long declared that he would not reveal any information that he obtained during his engagement by American and there is no evidence that he did.

Defendants' contention, that the MD-11 that is the subject of the ADO/MDC litigation is different from the MD-11 within the scope of defendants' engagement by American, is illusory. Similarly, defendants' contention that ADO is not adverse to American because American is not a named party in the ADO/MDC lawsuit is unconvincing. After all, American was the target of discovery proceedings initiated by ADO and directed at documentation that American regards as privileged and confidential. Consequently, American was directly involved in the litigation and its interests were clearly in conflict with ADO's. That of course is the predicate of Long's commitment to not reveal information he gleaned as American's lawyer. By refusing to answer at the federal rule 30(b)(6) deposition any questions relating to American, Long demonstrated that he was attempting to protect American's interests. His error was the product of advancing his own professional and pecuniary interests and presuming he could do so without compromising his fiduciary duty to American. By viewing the permissible scope of the rule 30(b)(6) deposition from a narrow and self-serving perspective, defendants, and Long in particular, concluded that no conflict existed. Defendants undoubtedly conducted themselves in a manner that American fairly perceived as a willful and conscious disregard of its interests. Likewise, defendants decided to characterize their attorney-client relationship with American as essentially having ended in mid-1995, rather than viewing it as continuing on a sporadic but ongoing basis. This, too, was disingenuous and demonstrated a conscious disregard of American's rights.

The question is whether defendants' conduct may be characterized as "despicable." ■ "Despicable conduct" has been described as conduct which is " '. . . so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people.' " (*Mock v. Michigan Millers Mutual Ins. Co., supra,* 4 Cal.App.4th 306, 331, quoting BAJI No. 14.72.1 (1989 rev.).) "Such conduct has been described as '[having] the character of outrage frequently associated with crime.' (*Taylor v. Superior Court* (1979) 24 Cal.3d 890, 894 [157 Cal.Rptr.

693, 598 P.2d 854].) As well stated in *Flyer's Body Shop Profit Sharing Plan* v. *Ticor Title Ins. Co.* (1986) 185 Cal.App.3d 1149, 1154 [230 Cal.Rptr. 276]: '[A] breach of a fiduciary duty alone without malice, fraud or oppression does not permit an award of punitive damages. [Citation.] . . . Punitive damages are appropriate if the defendant's acts are reprehensible, fraudulent or in blatant violation of law or policy. The mere carelessness or ignorance of the defendant does not justify the imposition of punitive damages. . . . Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate.' " *(Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1287 [31 Cal.Rptr.2d 433].)

The conduct engaged in by defendants in this case does not reach the level of despicability found in cases in which punitive damages were found to be proper. (See, e.g., *Waits v. Frito-Lay, Inc.* (9th Cir. 1992) 978 F.2d 1093 [defendants intentionally imitated singer in advertising campaign, knowing singer opposed commercial endorsements by musicians]; *Hughes v. Blue Cross of Northern California* (1989) 215 Cal.App.3d 832 [263 Cal.Rptr. 850] [insurer refused to cover hospitalization of mentally ill insured due to incompetent and reprehensible company practice]; *Ball v. Posey* (1986) 176 Cal.App.3d 1209 [222 Cal.Rptr. 746] [attorney exercised undue influence over elderly, frail client in order to convert her assets to his own use].)

In *Taylor v. Superior Court, supra,* 24 Cal.3d 890, a personal injury action against an intoxicated driver in which our Supreme Court approved an award of punitive damages, the court made the following statement which we find instructive: "[A] conscious disregard of the safety of others may constitute malice within the meaning of section 3294 of the Civil Code. In order to justify an award of punitive damages on this basis, the plaintiff must establish that the defendant was aware of the probable dangerous consequences of his conduct, and that he willfully and deliberately failed to avoid those consequences." *(Id.* at pp. 895-896.)

What sets this case apart from those referenced above is that, having made the self-serving decision to work for ADO in disregard of American's wishes, Long did not then conduct himself in a manner which ultimately compromised American's confidential information. Without dispute, he staunchly refused to reveal any confidential or privileged information regarding American in response to questioning by MDC during the federal rule

30(b)(6) deposition.[15] Because he would not answer these questions, he was found to be an inadequate rule 30(b)(6) witness for ADO. In effect, he held American's interests above those of ADO. He had obtained a conflict waiver from ADO to the effect that ADO would not object if American wanted to use him as its lawyer in the future. In addition, he had been told by ADO, even if he did not pass the information along to American, that ADO would not subpoena American in the litigation against MDC. There is no evidence that he was aware at the time he accepted the ADO employment that there was an outstanding sixth discovery request directed at MDC which could involve the production of American-related documents and that American would want him to protect its interests by opposing that production. In summary, Long did not willfully and deliberately fail to avoid the harmful consequences of his adverse representation, and in fact he was unaware of some of the probable consequences of his conduct in that he did not specifically know of the outstanding discovery request. What he did do was cause American to expend efforts to have him removed as ADO's rule 30(b)(6) witness to avoid his revealing its confidential and privileged information. Based on all the evidence, however, there did not appear to be any imminent danger of his doing so. Strictly construing the evidence presented by defendants, and liberally construing the evidence presented by American, we cannot conclude that triable issues of fact were presented from which a jury could conclude by clear and convincing evidence that defendants' conduct sunk to the level of being "despicable."

Lastly, American argues that a triable issue of fact was presented about the existence of fraud, an alternate predicate for the imposition of punitive damages. American claims defendants committed fraud by concealing key facts, namely that Long and SMRH represented Wawro, Russo, and MLB in unrelated litigation in 1994; that Long discussed the ADO case with Wawro and gave him copies of discovery requests he had prepared in a case against Continental, as well as names of potential expert witnesses; that Long gave Wawro the indices he had prepared of the American-related documents at issue in the discovery request involving MDC; that Long was asked to serve as ADO's federal rule 30(b)(6) deponent and received documents to review

---

[15]While American argued that Long had already revealed confidential and privileged information, and continued to do so in defense of his appearance on behalf of ADO, at worst that information consisted of the following: the reasons American objected to the ADO employment, the kind of engines used in the MD-11's purchased by American (GE versus the Pratt & Whitney engines in the ADO MD-11's—information which was public because it had been disseminated in the press), the details of Long's and American's conversations and decisions during February 1996 regarding the possibility of ADO's serving a subpoena on American, the fact American asked MDC to withhold certain documents from ADO, details of billing information, and the fact of American's retention of other counsel to represent it in the MD-11 negotiations with MDC.

as ADO's representative at the same time he was advising American on how to respond to a possible subpoena from ADO; and that Long failed to tell American that ADO would not require American to produce its MD-11 documents if American did not want to do so. We are not persuaded.

Fraud is defined in Civil Code section 3294 as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." There is no evidence that any of the alleged concealments by Long were of any consequence or adversely affected American. Long told American that he knew ADO's attorneys and had a working relationship with them. His representing MLB and its lawyers and providing them with sample discovery requests and recommendations of expert witnesses that had nothing to do with American do not lead to the conclusion that he was violating his fiduciary duty.

Further, American does not present evidence that Long's representation of it in the ADO litigation resulted in anything other than a mutually agreeable resolution of the discovery dispute. Thus, his alleged failure to reveal (1) that he gave ADO's lawyers the indices of American's documents and (2) that ADO had decided never to subpoena American's documents, resulted in no damage to American. American does not contend and has not proved that specific confidential and privileged documents were provided to ADO at Long's behest. As it turned out, ADO never served a subpoena on American.

Finally, Long's discussions with ADO concerning serving as its federal rule 30(b)(6) representative while he was still representing American undoubtedly led directly to his assuming an adverse representation. Such conduct does not, however, constitute fraud within the meaning of Civil Code section 3294. Even though Long acted to further defendants' interests, evidence is wholly lacking to indicate that it was done with the intention of harming American. It is undisputed that Long did not begin reviewing the ADO documents until after he notified American that he was going to serve as ADO's representative, and had announced his view that there was nothing further for him to do in representing American in the ADO litigation.

Though defendants' conduct was improper, and a violation of the State Bar Rules of Professional Conduct, Long's assumption that a lawyer may accept a position other than as a lawyer with a party adverse to a former or present client is not so opprobrious as to compel the conclusion that he acted with a pernicious motive. Taken as a whole, and even construing the facts

most favorably to plaintiffs, we conclude that this is not a case in which a jury could determine by clear and convincing evidence that punitive damages are warranted. We will not disturb the trial court's grant of summary adjudication.

B.-D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

E. *Award of Costs, Including Expert Witness Fees, Against American Based on Refusal of Code of Civil Procedure Section 998 Offer*

■ The court awarded to defendants $126,022.79 in costs, including $58,787.50 in expert witness fees, based on the fact American rejected defendants' offer to settle pursuant to Code of Civil Procedure section 998 (hereafter section 998). Defendants had offered to settle the lawsuit for $59,200, in return for American's dismissing the lawsuit with prejudice; the offer to settle did not provide for entry of judgment in favor of American. American was awarded monetary damages of $8,174, plus preoffer costs of $26,815.16, which together totaled $34,989.16.

American contends that it did, in fact, obtain a judgment more favorable than defendants' section 998 offer, and thus the trial court erred in awarding costs to defendants. According to American, its primary purpose for litigating was to obtain a determination that defendants' conduct was improper and constituted a breach of fiduciary and professional duty. Therefore the judgment finding defendants liable for breach of fiduciary duty was in itself more favorable than a settlement for $59,200 without the entry of judgment in American's favor. American asserts that the plain language of section 998 requires that entry of judgment be part of any settlement offer.

At the time defendants made their settlement offer (Aug. 1997), section 998 provided: "(b) Not less than 10 days prior to commencement of trial, any party may serve an offer in writing upon any other party to the action to allow judgment to be taken in accordance with the terms and conditions stated at that time." It continued: "(c) If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment, the plaintiff shall not recover his or her costs and shall pay the defendant's costs from the time of the offer. . . . In addition, in any action or proceeding other than an eminent domain action, the court, in its discretion, may require the plaintiff to pay the defendant's costs from the date of filing of the complaint

*See footnote, *ante*, page 1017.

and a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, the preparation or trial of the case by the defendant."

In *Goodstein v. Bank of San Pedro* (1994) 27 Cal.App.4th 899 [32 Cal.Rptr.2d 740], an action for slander of title and negligence, the trial court granted a judgment of nonsuit in favor of the defendant bank. The bank filed a memorandum of costs and motion to recover expert witness fees, based on the plaintiff's rejection of the bank's written statutory offer to compromise. On appeal, the plaintiff argued that the bank's offer to compromise was defective for purposes of section 998 because it failed to allow judgment to be taken against the bank, and instead required that the plaintiff file a request for dismissal with prejudice.

The Court of Appeal held that "[t]he distinctions set up by appellant are not tenable." (*Goodstein v. Bank of San Pedro, supra,* 27 Cal.App.4th at p. 905.) The court pointed to Code of Civil Procedure section 577, which defines "judgment" as " 'the final determination of the rights of the parties in an action or proceeding.' " (*Goodstein,* at p. 905.) It concluded: "The word 'judgment' in Code of Civil Procedure section 998 indicates that the statute contemplates that an offer to compromise which is accepted will result in the final disposition of the underlying lawsuit; the statute does not indicate any intent to limit the terms of the compromise settlement or the type of final disposition. The acceptance of the instant compromise agreement calling for a voluntary dismissal with prejudice would have finally disposed of the complaint as effectively (see Code Civ. Proc., § 581d) as one calling for entry of judgment in favor of plaintiff. [¶] In light of the foregoing, we conclude that the instant offer to compromise meets the requirements of subdivision (b) of Code of Civil Procedure section 998." (*Id.* at p. 906.) "[A]s between the parties thereto and for purposes of enforcement of settlement agreements, a compromise agreement contemplating payment by defendant and dismissal of the action by plaintiff is the legal equivalent of a judgment in plaintiff's favor."[19] (*Id.* at p. 907.)

We note that after the offer at issue here was made, the Legislature amended section 998, subdivision (b) (Stats. 1997, ch. 892, § 1) as follows: "Not less than 10 days prior to commencement of trial . . . , any party may

---

[19]One member of the appellate court dissented. His disagreement, however, centered around the inclusion of a general release clause in the offer to settle, which would release not only the parties in the lawsuit at issue but also would foreclose the plaintiff from pursuing related actions against other parties. The parties in the matter before us do not contend that defendants' offer to settle contained a general release clause.

serve an offer in writing upon any other party to the action to allow judgment to be taken *or an award to be entered* in accordance with the terms and conditions stated at that time." (Italics added.) While we do not hold that the amended language applies to the settlement offer at issue here, the fact that the Legislature expanded the language of the statute—we must presume with knowledge of the holding in *Goodstein*—suggests to us that the Legislature generally approved of the conclusion reached in *Goodstein*, that entry of judgment in court is not strictly required.[20] We conclude that defendants' offer to settle was a valid one pursuant to section 998.

A more difficult question is whether and how to evaluate the worth to American of winning a jury verdict against defendants, in determining whether American actually obtained a judgment more favorable than defendants' section 998 offer. American contends that the primary purpose of pursuing this litigation was to obtain a declaration of defendants' wrongdoing, rather than to obtain a monetary judgment.

American's arguments are not unjustified. It does strike us as counterintuitive and regrettable, at the very least, that here a plaintiff who prevailed against defendant attorneys in an action for breach of fiduciary duty should ultimately have to pay those same attorneys nearly $100,000. We cannot see how section 998 could retain any vitality, however, if in each case in which it comes into play the plaintiff can attempt to argue that any judgment declaring wrongdoing by the defendant is worth more than the monetary amount offered in settlement. Such an interpretation of section 998 would simply be unworkable. We therefore decline to hold that the trial court abused its discretion in finding defendants' section 998 offer to be valid, and in awarding defendants costs including expert witness fees.

As to the amount of the expert witness fees awarded, American argues that, due to a statutory amendment to section 998,[21] defendants should not have been entitled to an award of fees incurred during trial. Unfortunately for American, section 998 was again amended during the pendency of this appeal, such that a trial court may in its discretion "require the plaintiff to pay a reasonable sum to cover costs of the services of expert witnesses . . .

---

[20]"While an intention to change the law is usually inferred from a material change in the language of the statute [citations], a consideration of the surrounding circumstances may indicate, on the other hand, that the amendment was merely the result of a legislative attempt to clarify the true meaning of the statute. [Citations.]" (*Martin v. California Mut. B. & L. Assn.* (1941) 18 Cal.2d 478, 484 [116 P.2d 71].)

[21]Effective January 1, 1998, section 998 provided that a plaintiff could be required to pay the costs of services of expert witnesses "actually incurred and reasonably necessary in preparation for trial or arbitration of the case by the defendant." (Stats. 1997, ch. 892, § 1.)

actually incurred and reasonably necessary *in either, or both, preparation for trial* or arbitration, or *during trial* or arbitration, of the case by the defendant." (Italics added; Stats. 1999, ch. 353, § 1.) As American correctly points out, "[s]tatutes increasing or decreasing litigation costs, even if silent on the issue of retroactivity, have consistently been applied to cases pending when they become effective. [Citations.] This rule applies even when the statutory scheme is revised while the case is pending on appeal. [Citations.]" (*Heritage Engineering Construction, Inc. v. City of Industry* (1998) 65 Cal.App.4th 1435, 1439 [77 Cal.Rptr.2d 459].)

Finally, American contends that the trial court abused its discretion in awarding defendants $19,307.33 for imaging documents and deposition transcripts, and for display equipment rental. We disagree.

Code of Civil Procedure section 1033.5, subdivision (a)(12) lists as allowable costs: "Models and blowups of exhibits and photocopies of exhibits," "if they were reasonably helpful to aid the trier of fact." While admittedly "high-tech," the methods defendants used to display documents to the jury were specifically approved by the trial court, which found them to be highly effective, efficient, and commensurate with the nature of the case. We can find no abuse of discretion under these circumstances. (Cf. *Science Applications Internat. Corp. v. Superior Court* (1995) 39 Cal.App.4th 1095 [46 Cal.Rptr.2d 332].)

### DISPOSITION

The judgment and the postjudgment order awarding attorney fees are affirmed. Each party is to bear its own costs on appeal.

Hastings, J., and Curry, J., concurred.